Argued March 10, affirmed July 1, 1959

# STATE LAND BOARD *v.* SAUSE ET AL

### 342 P. 2d 803

*Lloyd G. Hammel,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief was Robert Y. Thornton, Attorney General, Salem.

*John J. Coughlin* and *Warren Hastings, Jr.,* Portland, argued the cause for respondents and intervenors. With them on the brief were McMinimee & Kaufman, Tillamook, and Phillips, Coughlin, Buell & Phillips, Portland.

Before PERRY,[*] Chief Justice, ROSSMAN, LUSK and McALLISTER,[**] Justices.

ROSSMAN, J.

This is an appeal by the state through its land board (ORS 273.410) from a decree of the circuit court which, after trial of the suit, dismissed the complaint that the board had filed in the name of the state. The defendants are Henry Sause and Curtis Sause, partners who do business under the name of Henry Sause & Son. The business of the partnership is logging and the operation of a log dump. After the suit was filed Frank and Anna Emmenegger, who allege that they are the owners of the narrow strip of land, 300 feet long, which is the subject matter of this suit, became intervenors. The Sauses have possesson of the strip as lessees of the Emmeneggers. Hereafter, when we use the word defendants we will mean both the Sauses and the Emmeneggers. There is no controversy between them. The purpose of the suit is to secure a decree holding that the strip which is part of the north bank of the Tillamook river within the port of Tillamook bay is tideland. The suit seeks an injunction and damages. The defendants contend that no tideland exists in the contested strip.

The challenged decree held that the strip is tideland, but refused to grant an injunction or other relief because ORS 777.120 (1), so the circuit court held, gave "full control" of the strip to the port of Tillamook bay.

In appealing, the state does not challenge the finding that tideland exists at the locus in quo, but attacks

---

[*] Chief Justice when case was argued.
[**] Chief Justice when this decision was rendered.

the circuit court's interpretation of ORS 777.120 (1). The defendants-respondents filed a cross appeal which submits four assignments of error. They charge: (1) there is no tideland at the locus in quo, (2) if the land in question became submerged, the submergence did not occur gradually, imperceptibly or through the forces of nature and (3) the trial court erred in refusing to consider the affirmative answer which alleged riparian rights and usages.

The narrow strip of land which is the subject matter of this suit is 300 feet long and at its widest place is 12.2 feet broad. It constitutes in part the north bank of the Tillamook river, a navigable stream, which is affected by the flow and ebb of the tides. The strip lies about three miles from where the river enters Tillamook bay and twelve to fourteen miles from the ocean. The purported tideland is part of a parcel upon which the Sauses in 1941 built a log dump which they have operated ever since as a means of transferring from their log trucks to the water the logs which they produce in the area known as the Tillamook burn. Although the parcel extends along the river for 300 feet, the log dump is only 125 feet long. The dump stands at the river's edge and in part upon the ground which the state claims as tideland. The state contends that the strip slopes into the river and that it is alternately covered and uncovered by the flow and ebb of the tides. The defendants assert that until the north bank of the river, at the locus in quo, was somewhat altered in the construction of the log dump and in work upon a nearby dike it was perpendicular and that, therefore, there is no tideland at that place. They also contend that at times of freshets no tidal action occurs at the strip.

The log dump consists of (1) pilings which were

driven into the ground at the water's edge, (2) planking upon which the trucks run and which is supported by timbers which rest in part upon the pilings (3) two small structures which house the mechanical equipment that tips the logs from the trucks into the stream and (4) a "brow log" which lies upon the platform at its outer edge next to the water. Log trucks which enter the wharf run adjacent to the brow log and there the mechanical equipment tips the logs into the water. The state does not claim that the log dump is not a useful lawful structure. Since its construction it has been in constant use.

The state argues, as we have said, that the part of the strip which abuts upon the river is "state land," more specifically, "tideland" within the meaning of ORS 273.010 which provides:

> "Unless the context or a specially applicable definition requires otherwise, for the purpose of this chapter state lands are classified as follows:
>
> * * *
>
> "(6) 'Tide and overflow lands.' All lands over which the tide ebbs and flows from the line of ordinary high tide to the line of mean low tide, and all islands, shore lands and other such lands held by the state by virtue of her sovereignty."

The complaint, referring to the parcel just described, alleges:

> "* * * the defendants committed certain acts of purpresture and trespass on said state-owned tidelands, in that said defendants, without the consent or permission of the plaintiff, did wilfully, intentionally and unlawfully break and enter into and upon plaintiff's said tidelands, constructed and are presently maintaining a certain log dump * * *."

The trial judge, at the conclusion of the trial, found that no tideland existed at the locus in quo, but a few

days later adopted a different view. Upon altering his view he held that tideland existed at the place in question but that under ORS 777.120 (1) the state had surrendered its tidelands within the boundary of the port of Tillamook bay to that municipality and hence had no interest in them. We will now take note of the evidence.

Mr. Leslie Warfield, an engineer in the state's employ, prepared a scale-drawn plat of the 300-foot strip. The state rests its case largely upon this drawing. The latter represents the conditions as they existed June 24 and 25, 1954, when Warfield made his only visit to the place. The plat (1) depicts the 300-foot length of river frontage including the log dump, (2) shows the purported tideland of varying width along the 300-foot strip (with the exception of a section 55 feet long), and (3) marks off the 300 feet of alleged tideland into 25-foot sections (with one exception of 55 feet) and accompanies each 25-foot section with a profile or cross section drawing which portrays the width and slope of the purported tideland in that particular section.

Mr. Warfield, in obtaining the data which his drawing represents, visited the property and went under the log dump. At the easterly extremity of the parcel the drawing shows overflow land 12.2 feet in width. At station 0 + 25 (25 feet west of the easterly extremity) the so-called tideland is 8.6 feet broad; at station 0 + 50 it is 5.7 feet broad; at station 0 + 75 it narrows to 1.3 feet. In that way the drawing and its data go on for the entire three hundred feet of the river frontage. At station 1 + 50, that is, 150 feet west of the easterly line of the parcel, Mr. Warfield found a wall or bulkhead. At that point he was under the log dump and very near the part over which the brow

log lies. For the next 55 feet Mr. Warfield found the space under the log dump completely filled with rock and other material. His drawing does not show any overflow land in that 55-foot area. The entire river front of the 55-foot section, whether it consists of rock or piling, is represented upon the plat by a perpendicular line. West of the 55-foot area tideland is again shown in the drawing. Accordng to the latter, the purported tideland in that area varies in width from 11.2 feet at station 2 + 25 to 4.5 feet at station 2 + 75. At the westerly line of the parcel (station 3 + 00) the width is 7.5 feet.

The strip of land entered upon Warfield's drawing as tidal overflow land is the subject matter of the controversy. As we have said, the Sauses and Emmeneggers deny that any tideland exists at the place represented by the drawing. It will be recalled that the drawing represents conditions as Warfield found them June 24 and 25, 1954. We have mentioned the fact that the defendants assert that prior to 1941, when the log dump was built, the north bank of the river at the place in question was perpendicular. At that time a dredger gave it a slope of about 45 degrees.

Having taken note of the issues, we quote the following from Gould on Waters, 3rd ed., page 315, for the purpose of affording an impression of the controlling rules as we examine the facts in greater detail:

"* * * If navigable waters, owned by the Crown or State, suddenly encroach upon private lands adjoining, and there are marks by which their limits can be determined, the title to the soil thus covered remains in the former owner, and upon the recession of the water it is restored as his property. Though the overflow continues for forty years, yet if the water recedes the owner has his land again. Slow

changes in a boundary river between nations, or between States after their admission into the Union, do not affect their dominion and jurisdiction. Where the side of an island was gradually washed away by tide-water, and the soil was afterwards restored by the deposit of alluvion, the new soil was held to belong to the owner of the fast land. But if the sea gradually and imperceptibly encroach upon private lands, or the bounds are lost, and the situation and extent of the lost land cannot be ascertained, or if a mere bar or shoal is formed, it belongs to the Crown at common law, and in this country to the State."

Tillamook river is a short stream. Its depth at the place in question in the summer time is ten to twelve feet. The rise and fall of the tide in that season of the year is between five and eight feet. Since Tillamook river flows in an area of heavy rainfall it is affected by freshets and floodwaters. During periods of freshets the river's flow in the area where the log dump is located becomes swollen and may achieve sufficient volume so that the flow will take place in the direction of the sea only, and no upstream action, caused by the tide, will occur. At such times, as the mass of water increases, the tidal effect becomes less and less perceptible until for a period of as much as 72 hours no rise or ebb of the tide can be detected. As the mass of water diminishes, tidal action will again become noticeable and, before long, normal tidal action will recur. In the freshet season conditions such as those just described may take place more than once.

Prior to the construction of the log dump and as far back as any one's knowledge upon the subject extended, the north bank of the Tillamook river at the locus in quo was perpendicular or nearly so. The state itself at the conclusion of the reception of evidence

asked the trial judge to sign a requested finding which contained this:

> "* * * the north bank of the Tillamook River * * * was almost perpendicular in its original condition and was substantially in same condition just prior to the time defendants constructed the log dump. * * *"

The evidence, as we will presently see, clearly supported the requested finding.

The record indicates that before the log dump was built the upper two feet of the bank extended six or eight inches over the stream while the lower portion was upright. The overhang of the upper two feet caused the lower part of the bank to appear to be undercut. The cause of the peculiarity was a heavy growth of roots in the upper part of the bank which knitted the soil together and held it intact. In addition, branches of salal and other bushes drooped down over the top of the bank and thereby gave that portion further protection. A witness described the condition as "characteristic of tidelands."

Although the parcel in question lies next to the main channel of the river, the north bank of the latter eroded only three feet from the year 1856, when the meander line was established, to 1947. The trial judge ruled that since the erosion was gradual the common boundary of the state's land and that of the abutting riparian owner followed the course of the erosion. The holding is not challeneged on appeal.

Based upon the contention that the north bank upon which they built their log dump was perpendicular, the defendants urge that no tideland existed there. Although the evidence upon the subject is not extensive, it indicates that in 1941, preliminary to the construction of the log dump, a dredge sloped the bank to an incline

of possibly 45 degrees. After that had been done the log dump was built. In the same general vicinity of time work upon a dike appears to have also affected a part of the north bank of the river. Photographs of the dump taken shortly before the trial show that the bushes whose roots previously knitted the upper soil of the bank into a cohesive mass had disappeared. A conclusion appears warranted that the disappearance was due to (1) the action of the dredger, (2) the construction of the log dump over the place previously occupied by the bushes and (3) the operation of the log trucks.

We see from the facts just mentioned that although prior to 1941 the north bank was perpendicular, it now assumes the form of tideland. See ORS 273.010 and *Sengstacken v. McCormac*, 46 Or 171, 79 P 412, and *Andrus v. Knott*, 12 Or 501, 8 P 763. Although the north bank has the form of tideland, it seems clear that it was given the form largely by man-made means. We turn then to the question whether those overflow lands are in truth tidelands with the title to them in the state. The defendants contend that the action which sloped the bank so as to enable the construction and operation of the log dump did not create tideland. They argue that the sloping did not come about gradually and in an imperceptible manner, but in a brief period and subject to plain observation. Likewise, they point to the fact that the cause of the change was not nature, but in large part power-driven machinery.

Since the logs which come from the Tillamook burn are old, bark and decayed sapwood are torn loose when a log drops into the river. Its entry into the water creates a strong wave action which washes the bank and casts about bark, silt and sapwood. Some of the debris which is torn from the logs as they enter the

water lodges in the bed of the river. In order to maintain a depth in the river sufficient to meet their needs the Sauses have the river bed in the vicinity of the log dump dredged twice yearly. Evidence mentions work which is performed upon the river bank occasionally to maintain its lines.

Oscar K. Tittle, a farmer and construction man, was the first witness called by the state. In 1941 he built the defendants' log dump. He was 66 years of age at the time of the trial and had lived all of those years in Tillamook county. He testified that as a boy he went up and down the river "dozens of times" in the vicinity where he later built the log dump and went over the same course in later years "hundreds of times." The bank of the river at the place in question, according to him, "was about perpendicular, about straight up and down." He added, "possibly a little bit undercut, not necessarily a bank but brush, salal brush, roots of trees and debris—what we call undercut a little bit. * * * due to the fact that those roots would hang on, they don't give way, so the bank can erode a little, maybe six or eight inches less than perpendicular or the other way—undercut, in other words."

The next witness called by the state was the defendant, Curtis Sause. He testified that his firm began in 1937 or 1938 to seek a site where it could build a log dump, and that in so doing he viewed the property upon which in 1941 it built the log dump in question. According to him, the bank "was right straight up."

Fred Burton, 80 years of age, had lived in the vicinity of Tillamook virtually all of his life. He was another witness called by the state. In earlier years he had been engaged in the logging industry and had become intimately familiar with the Tillamook river. He swore that the banks of the stream at the place

where the log dump was constructed "was pretty straight up and down."

The three witnesses of whose testimony we have just taken notice were called to the witness stand by the state. There is no contention that any one of them misspoke himself, was impeached or was of such inferior character that he was unworthy of belief. It will be observed that the three described the bank as it was before the log dump was built in 1941.

E. J. Gienger, a witness for the defendants, testified that in 1889 he came to the general area where the log dump has since been built and logged there for many years. According to him, the north bank of the stream at that time "was almost straight up and down." Further, he testified, "At that time there was brush, salal brush and stuff, and it would hang over the bank and then down. You see, the formation of the ground there is kind of a mud flat, yellow—or blue—mud; otherwise it would cave in lots more than it does— that way it's straight." He added that even at low tide the bank at the Sause log dump extends down into water, in other words, no beach, bar or shoal is uncovered at the foot of the bank when the tide has ebbed. The witness explained that his testimony covered the period beginning with 1902 and that "it always looked like it was straight up and down."

The state presented a printed form entitled Application to Lease Tidelands which is addressed to the land board and bears the signature of defendant Curtis Sause. The part upon which the state relies reads, in part:

"I, we, hereby apply to lease the following described tide lands * * *."

At that point there follows a description of the parcel

which the state claims as tideland. The instrument then continues:

> "This application is made with full knowledge of the character of the land applied for and of the title of the State thereto, and ———— hereby waive and relinquish all right to and claim upon the State for the return of the rental price of said lands in case said lands or any part thereof do not belong to the State."

The paper was not prepared and signed until seven years after the log dump was constructed.

The state construes Sause's signature to the paper as an admission by him that tidelands existed at the place in question. We have taken notice of Sause's explanation of his signature to the paper. In view of it we doubt whether the paper constitutes an admission. In any event, we believe that the other issues of this case are too important to attach anything of consequence to this paper.

Although the foregoing review of the evidence omits some details and the mention of some witnesses, we believe that it suffices to enable a disposition of the appeal.

At the conclusion of the evidence the trial judge declared:

> "The Court finds as a matter of fact in this case that the land upon which the defendants now have located their log dump is not now, and never has been, tideland and therefore that the State of Oregon has no title or right in that property. The Court has made that finding upon this reasoning: the evidence, and from the State's own witness, Oscar Tittle, establishes that originally the bank of the Tillamook River on the north side, and at the location where the log dump is now situated, originally and before the construction of the dump,

that the bank of the stream there was perpendicular, or very nearly so * * * but the main point I want to make is that it seems to be the uncontradicted evidence in this case that many, many years ago, and before the time that the log dump was constructed, the bank of the stream at the point where we are concerned was perpendicular, or very nearly so * * *."

The trial judge believed that the time that Oregon was admitted into the union (February 14, 1859) was determinative of the issue as to whether tideland existed at the locus in quo, and that since the north bank at that time was perpendicular there was no tideland at that place. Before the decree was entered a restudy by him of Warfield's drawing caused the trial judge to alter his views with the result that he then found that at the site of the log dump there was an area which constituted tideland. Even though the trial judge then came to the conclusion that tideland existed at the locus in quo, he nevertheless held that the state was not entitled to a decree. In so ruling he depended upon ORS 777.120 (1) which reads:

"To the full extent which the State of Oregon might itself exercise and control or to which it can grant to ports the right to exercise the same, ports shall have full control of all bays, rivers and harbors within their limits, and between their limits and the sea * * *."

The first question to which we will give attention is whether the state proved the existence at the site of the log dump of "state lands," that is, tidelands within the meaning of ORS 273.010 which is quoted in a preceding paragraph. It will be recalled that ORS 273.010 says that tidelands are "all lands over which the tide ebbs and flows." If effect is given to the conditions in the river bank that were created when the log dump was built and that are reflected by War-

field's drawing, the log dump site includes a narrow strip of river bank "over which the tide ebbs and flows." The defendants, however, argue in part that tidelands are only such lands as are daily or every 24 hours alternately covered and exposed by the tides. They call attention to the evidence above mentioned which shows that in periods of freshets no tidal action occurs at the place in question.

■ At common law, according to Angell on Tidewaters, 2nd ed., page 69, "the shore is that land only which is usually overflowed by *ordinary* tides." "Ordinary" tides are those "which happen between the full and change of the moon twice in twenty four hours." Id., page 68. In *Blundell v. Caterall,* 5 B & Ald 268, Lord C. J. Tenterden assumed that an act of Parliament reciting that a certain tract of land daily overflowed by the sea and to which the king in right of his crown claimed title meant only land ordinarily overflowed by the sea. In *Peyroux v. Howard,* 32 U S 324, 8 L Ed 700, the court, in determining the test of admiralty jurisdiction in so far as it depended upon locality, said:

"* * * it is bounded by the ebb and flow of the tide; and if the influence of the tide is at all felt, it must determine the question. No other certain and fixed rule can be adopted; and in determining this, we must look at the ordinary state of the water uninfluenced by any extraordinary freshets. * * *"

It, therefore, appears that tidelands are lands usually or ordinarily covered and uncovered every 24 hours by the action of the tides. The mere fact that during the freshets no tidal action can be detected for short periods does not establish that the land is not tideland.

The defendants contend that even if the trial judge could have found that there was, when the complaint

was filed, land at the locus in quo which was covered and uncovered every 24 hours by the action of the tide, he would not have been warranted in deeming such land as tideland for the reason that it was not in existence when the state of Oregon came into the union and did not come into being until after the defendants had built and begun to use their log dump. If the court finds, as the defendants insist it must, that the bank was originally perpendicular and that there were then no tidelands there, the court must decide whether the lands that have been since 1941 alternately covered and uncovered by the tide are "state lands," more specifically, "tidelands."

■ The defendants assert that "if the state acquired any tidelands at this location, it must have acquired the same upon its admission into the union as a sovereign state." Their position is based upon the following taken from *Gatt v. Hurlburt*, 131 Or 554, 284 P 172:

"Upon the admission of this state into the Union, the state of Oregon acquired title to all of the lands lying between the ordinary high water mark and the low water mark of all navigable streams affected by the ebb and flow of the tide which are located within its borders. * * *"

It is clear that Oregon, upon its admission into the union acquired title to the foreshore that then lay between the ordinary high and low water marks: *Winston Brothers Co. v. State Tax Commission*, 156 Or 505, 62 P2d 7; *State v. McVey*, 168 Or 337, 121 P2d 461, 123 P2d 181; *Hume v. Rogue River Packing Co.*, 51 Or 237, 83 P 391, 92 P 1065, 96 P 865; and *Bowlby v. Shively*, 22 Or 410, 30 P 154 (affirmed 152 U S 1, 38 L Ed 331, 14 S Ct 548). Since its admission into the union February 14, 1859, other foreshore has been created. The fact that the state acquired title to it as tideland and

that the defendants' position is unsound becomes evident from a study of *Wilson v. Shiveley,* 11 Or 215, 4 P 324. In that case the plaintiffs, owners of upland known as block 11 (original townsite of Astoria), asserted that the defendants without right claimed title to block 139 which abutted upon block 11 and which the plaintiffs insisted was tideland. The defendants claimed under patents and submitted the defense that on the date of the patents the land which the plaintiffs asserted had become tideland was entirely above high water mark and that the river (Columbia) had since then encroached thereon. The court, in finding no merit in the defense, said:

"* * * When land is submerged by the gradual advance of the sea, the sovereign acquires the title to the part thereby covered with water. *In re Hull & S. Ry. Co.* 5 Mees. & W. 327, the doctrine is laid down that 'if the sea, or an arm of the sea, by gradual and imperceptible progress encroach upon the land of the subject, the land thereby covered with water belongs to the crown.' There is in all such cases, where land is thus situated and contiguous to the sea, as the court say in *Trustees, etc., Town East Hampton v. Kirk,* 84 N. Y. 218, the possibility of gain or loss, to which all riparian owners are subject. They would be entitled to whatever should be gained from the sea by alluvion or dereliction, and their title was liable to be lost by the advance of high-water mark, so as to bring the strip reserved within the ebb and flow of the tide. So, too, in *Mulry v. Norton,* 29 Hun, 660, the court say: 'Where land is overflowed, and the advance of the sea is so slow and gradual that its progress is imperceptible, the sovereign acquires the title to the part of the shore submerged.' * * *"

Then the court expressed its reaction to the case before it by saying:

"* * * So that if it be conceded that there was a strip of land intervening originally, as claimed,

it is clear from the evidence that the title to it has been lost by the gradual encroachment of the sea submerging it. The state, as sovereign, owned the tide lands, and had the absolute right to dispose of them."

■ In *Nirdlinger v. Stevens*, 262 F 591, the court, referring to *Scratton v. Brown*, 4 Barn & Cress 488, said:

"* * * One of the questions in that case was whether a conveyance of certain property, lying between the high and low water marks, acquired originally by the grantor from the crown, conveyed that which from time to time, as the sea encroached upon or receded from the beach, lay between the high and low water marks, or only that which at the time that the deed was made was bounded by the then high and low water marks. It was held that, as the high and low water marks shifted, the property conveyed by the deed also shifted. In the course of his opinion, Judge Bayley said:

" '* * * The crown by a grant of the seashore would convey, not that which at the time of the grant is between the high and low water marks, but that which from time to time shall be between those two termini. * * *' "

Accordingly, we do not believe that the fact that there was no tideland in the strip on the day when Oregon achieved statehood is determinative of the issue as to whether any tideland was there November 8, 1952, when this suit was filed. Therefore, we are required to determine whether the construction work which was performed in 1941 together with the subsequent operation of the log dump, both of which altered the north bank from perpendicular to a slope of approximately 45 degrees, converted the locus in quo into tideland and gave the state title to it.

It is the defendants' position that, assuming that

lands which are gradually encroached upon by water may become tideland, yet in the case at bar the change was not gradual and was brought about by artificial means. The defendants argue that under those circumstances the state does not acquire the land which is inundated by the tides. If the court should find that the change was caused by artificial means, and in lieu of the trial judge's finding that it occurred gradually, conclude that it was observable as it was under way, then, pursuant to the usual rules which govern boundaries, it would follow that the state did not have title in the contested strip. The defendants call attention to *Washougal & L. Transp. Co. v. The Dalles, P. & A. Nav. Co.*, 27 Wash 490, 68 P 74, which held that (1) where there originally were no shorelands at the contested point and the lines of high and low water marks were practically coincident, differing only with the rise and fall of the river upon a particular bank and (2) where the shorelands that now appear at that point were caused in part by erosion of the bank and in part by debris caught and held by piling driven in constructing a wharf "the state had nothing at this place it could pass by a deed purporting to convey shore lands. It cannot be that shore lands created by the erosion of the banks of a stream within the boundaries of a private claim inure to the benefit of the state; nor can the state claim, as shore lands, fills in a river caused by artificial means." It will be observed that the facts of that case find to a large extent their counterpart in those of the case at bar.

The defendants further place reliance upon *Sengstacken v. McCormac*, 46 Or 171, 79 P 412, in which the court reported the facts as follows:

"* * * during the summer months there is a tidal rise and fall of about three feet, which daily

covers and uncovers a narrow strip of land, varying in width from a few inches to perhaps ten or twelve feet in places, between the foot of the bank and low water. During five or six months in the winter this land is entirely submerged. No part of it is daily covered and uncovered by the ebb and flow of the tide during the whole year. The bank of the river is steep and even perpendicular in some places, and of a sandy soil. The wash of the water caused by the winds, tides, and passing steamers has a constant tendency to undermine the bank and cause it to cave in and to cast sediment and silt up against the shore, thus forming a narrow strip of earth, which is at times exposed at low water, but which has no real permanent situs, but is shifted and changed more or less from time to time by the action of the water. Under these facts, the case is, in our opinion, ruled by the decision of this court in *Andrus v. Knott*, 12 Or. 501 (8 Pac. 763), and the doctrine there announced is controlling here.

"* * * Without further discussion of the testimony or of the law, we are agreed that, under the facts, the land claimed by the plaintiff is not tide or overflowed land, within the meaning of the law authorizing the sale and disposition of such land."

Although the case is distinguishable on the fact that the court could have found that the lands were not usually covered and uncovered every 24 hours by the tide, one may properly deliberate upon the question as to whether the other facts in the case to which those in the one at bar bear a striking likeness would not have moved the court to the same result. The policy consideration expressed in dicta in *Cook v. Dabney*, 70 Or 529, 139 P 721, seems to support such a view. In that case the upland owner sought relief against a grantee of tidelands abutting on his upland from interfering with his "right of access." The court granted the relief on the ground that the land was submerged

during most of the year and the alternate ground that the premises were within harbor lines established by the general government for purposes of navigation and the grant would interfere with the right of navigation. However, the court also said:

"It would seriously unsettle property rights of riparian owners and work great harm to navigation if it were permitted that the moment low water should disclose a sand bar that is liable to be scoured out by the next flood, one might apply to the state and get a deed in fee simple for such a place, and be authorized to use it as a basis for exactions against the upland owner."

In so stating, the court recognized what it considered the strong equitable claims of the upland owner.

The defendants argue that they, as owners of the upland at the locus in quo, had the right of access to the navigable part of the river and a right reasonably to exercise that right by building the log dump. They argue that if the court should find that there were no tidelands at the locus in quo when the Sauses built the log dump the subsequent creation of tideland did not make the log dump a purpresture.

Gould on Waters, § 21:

"* * * There is a broad distinction between a violation of the public right and an invasion of the proprietary interest of the Crown. The one creates a public nuisance; the other a purpresture. Any encroachment upon the king, either upon part of the demesne lands, or in public rivers, harbors, or highways, is called a purpresture. If a littoral proprietor, without grant or license from the Crown, extends a wharf or building into the water in front of his land it is a purpresture, though the public rights of navigation and fishery may not be impaired. * * * The remedy for a purpresture is either by an information of intrusion at common

law, or by information in equity at suit of the attorney general. * * *"

The defendants' position is that if the court should conclude that no tideland existed originally at the place in question they, as the proprietors of the upland, had the right to build the log dump, and that the subsequent creation of tideland did not make the log dump a purpresture. But if the court should find that tideland existed originally at the location, then the defendants urge this court to hold that the English common law concerning purpresture never became the law of Oregon. They contend that in this state by long usage the upland owner has exercised the right of access by wharfing out.

*Bowlby v. Shively,* 22 Or 410, 30 P 154 (affirmed 152 U S 1, 38 L Ed 331, 14 S Ct 548), sustained the plaintiff's contention that the state may sell its tidelands and that its grantees take them free from any right therein of the upland owner and subject to the paramount right of navigation inherent in the public.

■ *Lewis v. City of Portland,* 25 Or 133, 35 P 256, recognized that a riparian owner on a navigable nontidal river had a right of access and wharfage which can be exercised without license from the state. The decision, after recognizing the long usage by upland owners on tidal and non-tidal rivers, said of the act under which tideland could be sold and under which the plaintiff purchased in the Bowlby case:

"* * * the act was only designed to provide for the sale of tide lands on tidal waters, the effect of which was inconsistent with any easement or right of the upland owner therein not granted to him in such act. * * *"

But the power to sell a fee simple interest in the tide-

lands is not inconsistent with a defeasible right of access and reasonable use thereof—a right which exists only until the state exercises its power to develop the lands or conveys them to someone else.

*Cook v. Dabney*, supra, recognized that the upland owner had, by reason of his right of access, a sufficient interest to obtain relief in equity against a party who was wrongfully on tidelands which abutted the plaintiff's uplands.

In *Harrison v. Pacific R. & Nav. Co.*, 72 Or 553, 144 P 91, the plaintiff owned a tract of timberland which fronted upon the tideland of Tillamook bay. He claimed that since his land abutted upon the bay he had access to the navigable water, and thereby a means of bringing his logs to market. The defendant wrongfully constructed a part of its railroad across two acres of the plaintiff's land, and by so doing denied to the plaintiff, according to his contention, access from his remaining land to the navigable water. The plaintiff's prayer sought damages representing the value of the land taken and also a sum as compensation for the destruction of the purported right of access. The defendant contended that it owned the tideland in front of the plaintiff's property and that consequently the plaintiff had no access to the navigable near-by water of the bay. The decision did not expressly hold that the plaintiff had a right of access across the defendant's tideland, but in affirming judgment for the plaintiff declared that when land's adjacency to navigation is seriously impaired or practically destroyed its owner is entitled to compensation therefor. Further, it said:

"The tidal waters in any arm of the sea constitute nature's highway, and the situation presented is analogous to one where a public county road

should be laid out and established over the defendant's upland. Under such circumstances, if it did any act to prevent the plaintiff's lawful access to such highway, it would be an element of damage. * * *"

In *Case v. Toftus*, 39 F 730 (Cir Ct Oregon) Judge Deady ruled:

"* * * as a littoral proprietor he has a right of access from his premises to the water, and to erect and maintain a private wharf there, at which to land and embark, so long as he does not materially interfere with the rights of the public, and subject to the power of the legislature to regulate such use or privilege. *Dutton v. Strong*, 1 Black, 25; *Railway Co. v. Schurmeir*, 7 Wall. 272; *Yates v. Milwaukee*, 10 Wall. 497; *Weber v. Commissioners*, 18 Wall. 57; Gould, Waters, §§ 124, 149, 151, 154."

The latest expression on the subject is *McCarthy v. Coos Head Timber Co.*, 208 Or 371, 302 P2d 238, in which Mr. Justice BRAND, in answering the defendant's contention that the owner of uplands has no riparian property interest in the abutting tideland but only a statutory preference, said:

"* * * This proposition requires some qualification. We must agree that our decisions indicate that the state may so dispose of tide lands as to deprive the uplands owner of any right thereto. Nevertheless there are well-recognized rights in the upland owners which are not derived from the statutory preference right and which have been recognized by the courts for many years. We refer to the common-law right of access to deep water. We are not here concerned with any question of the power of the state by proper procedure to limit or destroy the right of access without giving compensation when it deeds or leases tide lands to others than the upland owner. We cite the following authorities to show that both courts and legislature

have repeatedly recognized a public policy to protect the interests of upland owners in abutting tide lands. * * *"

For an interesting view of the manner in which New York State has handled the problem, see *People v. Mould*, 37 App Div 35, 55 NYS 453 [one judge dissenting], and *Town of Brookhaven v. Smith*, 188 NY 74 [three judges dissenting].

The vast majority of the states have rejected the English common law of purpresture, finding it unsuitable to the conditions of this country. As was noted, Mr. Justice LORD, in *Lewis v. Portland*, supra, recognized the usage in the state of Oregon of upland owners making reasonable use of their right of access. Such right was unchallenged until 1947.

█ The land at the locus in quo, according to the record, has no use and no value except as a means for exacting payment from the upland owner for the benefit of the state. In such a case, in balancing the defeasible right of access by the upland owner to navigable waters and his reasonable use thereof, against the interest of the public to the use of the tideland, it is clear that the use of the lands at the locus in quo by the defendants is reasonable and not injurious to the public use. We believe that the above approach to the problem is a reasonable one. It would be anachronistic if the state of Oregon should adopt a rule of law in 1959 which would treat the state as the king of England was treated in his proprietary capacity before the war for independence. It is our belief that the state has failed to establish that the defendants are committing any wrong upon the locus in quo which entitles it to the relief which it seeks. The evidence fails to show that the state has any need whatever for the strip of

purported tideland. The defendant's use of it, if the land is deemed tideland, does not interfere with navigation—to the contrary, it is an aid to navigation. The state, assuming that the strip is tideland, is its owner. If it ever requires the land's use for any public purpose it can obtain its possession.

The foregoing could suffice as a disposition of this cause, but since the latter is deemed a test case, we will go on and determine the effect of the facts that the change in the form of the river bank from perpendicular to a slope of about 45 degrees was the intentional work of the strip's owner and did not come about through the operation of the forces of nature gradually and imperceptibly but suddenly, discernably and through artificial means, that is, through the operation of a dredger. As previously mentioned, the change in the river bank's form was made in order to adapt it to the owner's industrial needs.

Although an occasional item of testimony indicates that an alteration to a near-by dike may have caused some additional water to flow against the north bank and possibly cause some erosion there, yet it is reasonable to believe that if the dredger had not altered the bank the latter would have retained its perpendicular lines in the future as it had for the scores of years that the record mentions.

The state now claims that the land which prior to 1941 was dry land but which the defendants' effort subjected to the action of the tides has passed into the state's ownership and that the defendants should be ejected from it.

■ As defined by Black's Law Dictionary (4th ed.), "accretion" is:

"The act of growing to a thing; usually applied

to the gradual and imperceptible accumulation of land by natural causes, as out of the sea or a river.

\* \* \*

"Additions of portions of soil, by gradual deposition through the operation of natural causes, to that already in possession of owner. \* \* \*

"Accretion of land is of two kinds: By *alluvion*, i. e., by the washing up of sand or soil, so as to form firm ground; or by *dereliction*, as when the sea shrinks below the usual water-mark. \* \* \* In determining whether change in course of river is by 'accretion' or 'avulsion,' test is not whether witnesses might see from time to time that progress has been made, but whether witnesses could perceive change while it was going on. \* \* \*"

"Avulsion," on the other hand, is defined as:

"The removal of a considerable quantity of soil from the land of one man, and its deposit upon or annexation to the land of another, suddenly and by the preceptible action of water. \* \* \*"

Blackstone (2 Blackstone's Commentaries, 262), on which many of the American cases rely, stated the effect of such additions on title as follows:

"And as to lands gained from the sea, either by *alluvion*, by the washing up of sand and earth, so as in time to make *terra firma*; or by *dereliction*, as when the sea shrinks back below the usual water-mark; in these cases the law is held to be, that if this gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining. For *de minimis non curat lex*; and, besides, these owners being often losers by the breaking in of the sea, or at charges to keep it out, this possible gain is therefore a reciprocal consideration for such possible charge or loss. But if the alluvion or dereliction be sudden and considerable, in this case it belongs to the king; for, as the king is lord of the sea, and so owner of the soil while it

is covered with water, it is but reasonable he should have the soil when the water has left it dry. * * *"

From this statement has come the general rule: if the change be gradual, the boundary of the upland will follow the water; if it be sudden, the boundary remains as before.

In the leading case of *The King v. Lord Yarborough*, 3 B & Cress R 91, 107 Eng Rep 668 (K B), the issue was title to flat lands which had "formed gradually by ooze and soil deposited by the sea." Sea walls marked the boundaries, and "the increase could not be observed when actually going on, although a visible increase took place every year, and in the course of fifty years a large piece of land has thus formed." The court said:

> "* * * It is clear upon the evidence, that the land has been formed slowly and gradually in the way mentioned in the plea. The argument was upon the word 'imperceptibly'; and for the Crown, two passages were cited from Sir Matthew Hale's treatise, De Jure Maris, wherein that very learned writer speaks of land gained by alluvion, as belonging generally to the Crown, unless the gain be so insensible that it cannot be by any means, according to the words of one of the passages, or by any limits or marks, according to the words of the other passage, found that the sea was there; idem est *non esse et non apparere*. In these passages, however, Sir Matthew Hale is speaking of the legal consequence of such an accretion, and does not explain what ought to be considered as accretion insensible or imperceptible in itself, but considers that as being insensible, of which it cannot be said with certainty that the sea was ever there. An accretion extremely minute, so minute as to be imperceptible even by known antecedent marks or limits at the end of four or five years, may become, by gradual increase, perceptible by such marks or limits at the end of a century, or even forty or fifty years. * * *

And considering the word 'imperceptible' in this issue, as connected with the words 'slow and gradual,' we think it must be understood as expressive only of the manner of the accretion, as the other words undoubtedly are, and as meaning imperceptible in its progress, not imperceptible after a long lapse of time. * * *"

The case was affirmed in the House of Lords, sub. nom. *Gifford v. Lord Yarborough*, 2 Bli N S 147, 4 Eng Rep 1087; 1 Dow & Clark 178, 6 Eng Rep 491 (H L), but on a slightly different ground, that of custom. As stated by the court, in 2 Bligh:

"* * * We think there is a custom by which lands from which the sea is gradually and imperceptibly removed by the alluvion of soil becomes the property of the person to whose land it is attached, although it has been the *fundus maris*, and as such the property of the king. Such a custom is reasonable as regards the rights of the king, and the subjects claiming under it, beneficial to the public, and its existance is established by satisfactory legal evidence."

The opinion then went on to describe the custom as reasonable; it stated that the land was of little value and concluded that its ownership by the upland owner would encourage him to improve it. Thus, as reported in 1 Dow & Clark:

"And the custom is reasonable; for the lord of the adjoining land converts the land as gained from the sea, gradually and imperceptibly as it is gained, into useful soil. When the sea retreats suddenly and leaves a tract of land uncovered, that land belongs to the Crown; but it is otherwise with lands gained gradually and impreceptibly by alluvion or projection. Such land is of no use to the King, but it may be useful to the owner of the adjoining lands, who gradually improves it as it is acquired, and thus may be said to have a title to it by occupation

and improvement. What Locke says in his Treatise on Government, about title gained by occupancy and improvement to land to which another has no title, shows the reasonableness of the custom. The addition is the compensation to the owner of the adjoining lands for the expense and trouble of embankments and improvements, and by those improvements the soil is rendered useful to the community * * *."

With the rule thus established that gradual additions go to the upland owner, the reciprocal question was considered in *In The Matter of The Hull and Selby Railway*, 5 M & W 327, 151 Eng Rep 139 (Exch, 1839), wherein it was held that land inundated gradually belonged to the king on the principle that "the party who suffers the loss shall be entitled also to the benefit." The rule as to "avulsion" was adopted by the English courts in *Attorney-General v. Reeve*, 1 Times L R 675, where title was given to the crown since the change was held to be "perceptible."

In this country, the gradual-sudden change distinction has been generally adopted, 56 Am Jur, Waters, § 477. For example, *Leonard v. State Highway Department*, 29 N J Super 188, 102 A2d 97, held that natural erosion of a dike, which caused flooding of the land in question by the tide, revested title in the state. Conversely, the issue of avulsion was considered in *Schwarzstein v. B. B. Bathing Park, Inc.*, 203 App Div (N Y) 700, 197 NYS 490, as follows:

"* * * The change in the foreshore by which the cove or bay formed at the westerly end of the property of the common grantor * * * submerging the land * * * was not a gradual or imperceptible encroachment on the land, but occurred by reason of avulsion, sudden or violent action of the elements perceptible while in progress. * * * Such loss of the land was not erosion or the gradual eating away

of the soil, and did not change the boundaries nor did the owner lose his title where the extent and quantity of his land was apparent, the owner endeavoring as best he might to protect and reclaim his property. * * *"

While Washington, under Article XVII of its constitution, has strictly construed and limited riparian rights, *Bilger v. State*, 63 Wash 457, 116 P 19; *State v. Sturtevant*, 76 Wash 158, 135 P 1035, in *Ghione v. State*, 26 Wash 2d 635, 175 P2d 955, the court pointed out that the state's title to land was not determined finally upon the condition of things at the time of admission to statehood, but may be affected by imperceptible changes in the course of a navigable river.

These general rules have long been adopted in Oregon. As early as the case of *Wilson v. Shiveley*, 11 Or 215, 4 P 324, this court stated, "where land is submerged by the gradual advance of the sea, the sovereign acquires the title to the part thereby covered with water," and held accordingly. In *Salem Improvement Co. v. McCourt*, 26 Or 93, 41 P 1105, the rule was stated as follows:

"* * * If by any sudden change in the course of the river, the old bed became filled with sand, gravel, and loam, the state was not thereby divested of its legal title, and neither plaintiff nor defendant could claim any interest therein, except as to such parts as had been added to their respective estates by imperceptible accretions, and the line where such accretions met would become the boundary of their estates: *Buse v. Russell*, 86 Mo. 209. * * *"

See to like effect *Gubser v. Town and Stoutenburg*, 202 Or 55, 273 P2d 430. See also *Hume v. Rogue River Packing Co.*, supra; 21 Ops Atty Gen 528 and 23 Ops Atty Gen 256.

The rule as above stated is almost universal in its

acceptance, the only question usually being whether or not the change was "imperceptible." When the cause of the change is not natural, but artificial, there is some divergence in the opinions. It will be noted that the definitions we quoted from Black, supra, expressly use the term, "natural." The majority of courts appear to place no reliance in this distinction, but merely look at the type of change, not the source, at least where the acts of third persons are involved. See annotation in 134 ALR 467, "Waters, rights in respect of changes by accretion or reliction due to artificial conditions." The earliest case noted therein is *Adams v. Frothingham*, 3 Mass 352. In that case the accretion had been caused in part by piers, which contributed to the natural build-up. However, the original patent to the land had been issued in 1680, some 122 years before the action was started. In arriving at its conclusion that the source of the change was immaterial when the length of time was considered, the court stated:

> "* * * Whatever increase, therefore, happened from natural causes, or from a union of natural and artificial causes, * * * must be to the benefit of the owner of the upland, or of him who owned the flats to which the increase was attached. This increase is of necessity gradual and imperceptible. No man can fix a period when it began, no testimony can mark the exact margin of the channel on any given day or year. The ancestor being seised of the estate, of which all the flats now demanded are part, and having the right by law to all such additions as should be made by the gradual retiring of the waters, he must be supposed to have been seised of all which now exists, for no one can show any parcel of which he was not seised. * * * we think this an instance in which we may safely apply the maxim, *De minimis non curat lex.*"

This reasoning, of course, sounds very similar to that

of Lord Hale, that is, since there is no way to ascertain the original boundary, we must hold that the upland owner is still bounded by the water.

In *Attorney-General v. Chambers*, 4 De G & J 55, 45 Eng Rep 22 (Eq., 1859) the additions were caused by the operation of a copper-works under license of the upland owner, so it was alleged. In holding that the accretions became a part of the land upon which the water deposited them, the court said:

"\* \* \* I am rather disposed to adopt the reason assigned for the rule by Baron Alderson, in the case of *The Hull and Selby Railway Company* (5 M. & W. 327), viz., 'That which cannot be perceived in its progress is taken to be as if it never had existed at all.' And as Lord Abinger said in the same case, 'The principle' as to gradual accretion 'is founded on the necessity which exists for some such rule of law for the permanent protection and adjustment of property.' It must always be borne in mind that the owner of lands does not derive benefit alone, but may suffer loss from the operation of this rule; for if the sea gradually steals upon the land, he loses so much of his property, which is thus silently transferred by the law to the proprietor of the seashore. \* \* \*

"Of course an exception must always be made of cases where the operations upon the party's own land are not only calculated, but can be shewn to have been intended, to produce this gradual acquisition of the seashore, however difficult such proof of intention may be."

The more recent case of *Brighton and Hove General Gas Co. v. Hove Bungalows, Ltd.*, [1924] 1 Ch 372, discussed and affirmed the rule and, in addition, pointed out the distinction between a sudden artificial change and a gradual silting up caused by artificial obstructions. *Attorney-General v. M'Carthy*, [1911]

2 Ir Rep 260 (K B), followed in the Brighton case, settled the issue of ascertainable boundaries, by holding specifically on the authority of the Lord Yarborough case, supra, that their presence does not prevent the application of the rules.

The leading American case on this facet of our problem is *County of St. Clair v. Lovingston,* 90 U S 46, 23 L Ed 59. There, river improvements had caused, at least in part, accretions. The court first stated:

> "* * * The proximate cause was the deposits made by the water. The law looks no further. Whether the flow of the water was nautral or affected by artificial means is immaterial."

Then, after quoting from Justinian, the Code Napoleon, and the language from Blackstone which we have also set forth, the court pointed out that it had been said in *New Orleans v. The United States,* 35 U S 662, that:

> " 'The question is well settled at common law that the person whose land is bounded by a stream of water which changes its course gradually by alluvial formations, shall still hold the same boundary, including the accumulated soil. No other rule can be applied on just principles. Every proprietor whose land is thus bounded is subject to loss by the same means which may add to his territory; and as he is without remedy for his loss in this way he cannot be held accountable for his gain.' "

Finally, in summary, the court stated:

> "In the light of the authorities alluvion may be defined as an addition to riparian land, gradually and imperceptibly made by the water to which the land is contiguous. It is different from reliction, and is the opposite of avulsion. The test as to what is gradual and imperceptible in the sense of the rule is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on. Whether

it is the effect of natural or artificial causes makes no difference. The result as to the ownership in either case is the same. The riparian right to future alluvion is a vested right. It is an inherent and essential attribute of the original property. The title to the increment rests in the law of nature. It is the same with that of the owner of a tree to its fruits, and of the owner of flocks and herds to their natural increase. The right is a natural, not a civil one. The maxim *'qui sentit onus debet sentire commodum'* lies at its foundation. The owner takes the chances of injury and of benefit arising from the situation of the property. If there be a gradual loss, he must bear it; if a gradual gain, it is his. The principle applies alike to streams that do, and to those that do not overflow their banks, and where dykes and other defences are, and where they are not, necessary to keep the water within its proper limits."

It will be noted that the court held that a person subject to loss by artificial means must bear it because he is the beneficiary of accretions when they occur. In some cases a party may have the right to have an artificial structure maintained so that he will not lose his land by erosion. See annotation in 88 ALR 130.

Some of the more recent cases supporting the rule that gradual artificial accretions go to the upland owner are: *Burket v. Krimlofski,* 167 Neb 45, 91 NW2d 57 (1958), (obstructions placed in the river by third parties); *Esso Standard Oil Co. v. Jones,* 233 La 915, 98 So2d 236 (1957), (new channel dredged which resulted in gradual drying up of old bed); *State v. 6.0 Acres of Land,* (N Hamp, 1958) 139 A2d 75, (artificial accretions from bridge structure); *Littlefield v. Nelson,* 246 F2d 956 (10th Cir, 1957), (allowing title to pass to upland owner where government construction added to natural accretion, though controlling statute

of Oklahoma spoke of "natural causes") ; and *Solomon v. City of Sioux City,* 243 Iowa 634, 51 NW2d 472, in which the court allowed a private owner to take title as against the state where federal dikes had caused accretions. In that case the court cited and followed the rule announced in 134 ALR 467; in so doing it said:

> "* * * We think it is a sound rule, especially in view of the fact that we recognize that the riparian owner has a right which can only be taken from him in accordance with established law; and if necessary that it be taken for public good, upon due compensation. * * *
>
> "* * * accretion due to artificial means over which a claiming riparian owner has no control belongs to the riparian owner in the same manner as naturally accreted land."

For earlier cases, see annotation in 134 ALR 467, supra.

Conversely, where the artificial shift in the water's course is sudden the courts hold that no change in the boundary is worked thereby. An example is *State v. Longyear Holding Co.,* 224 Minn 451, 29 NW2d 657, in which the state claimed title to a lake bed that had been artificially drained to permit mining. The court held that no change in the boundary was worked. Though the temporary nature of the change was emphasized, the court relied in part on Blackstone, supra (3rd ed., page 260). *Ziemba v. Zeller,* 165 Neb 419, 86 NW2d 190, held that the change caused by the construction of a diversion dam was sufficient to constitute an avulsion. Many of the cases which hold that the title has not changed involve fills to land, which, while sudden, are usually done by the upland owner, and therefore may come under either the converse to the usual rule, or the exception to it that an upland

owner cannot affect his boundary by artificially adding to his land.

The leading case for the proposition that filling land does not carry title is *Barney v. City of Keokuk*, 94 U S 324, 24 L Ed 224 (1877). It held that the upland owner retained his fee to the land filled by the city. *Park Commissioners v. Taylor*, 133 Iowa 453, 108 NW 927, denied riparian rights to the upland owner where the addition was caused by fills made by the owner, largely on the ground that the change was not caused by the action of the water. *Saunders v. New York C. & H. R. R. Co.*, 144 N Y 75, 38 NE 992, involved a filling in of a bay between the upland owner's property and a railroad which was built across the mouth of the bay. In holding that title to the land remained in the state, the court stated:

"Accretion is undoubtedly one of the modes by which a title to land may be acquired * * * The general rule is that, in order to give a littoral proprietor title to land by accretion, the increase must be by such imperceptible degrees that, although persons are able to perceive from time to time that the land has increased on the water line, they could not perceive the progress of the accumulation at the time it was made. (*Mulry v. Norton*, 100 N. Y. 424.) The filling up of the bay by cutting down the banks and bluffs above the shore certainly did not give title by accretion within this rule. * * * It may be true that when a man builds a structure upon his neighbor's land it becomes attached to and a part of the freehold upon which it stands and inures to the benefit of the owner of the soil * * *.

"But that principle has no application to this case, for the reason that here no one filled up any land to which the plaintiffs or any of their grantors had title, and the plaintiffs' grantors could not acquire title by filling up lands under water that belonged to the state. * * *

"There is not, I think, any authority in this state to sustain the proposition that an adjacent owner can acquire title to lands under the waters of the Hudson river below high-water mark by filling it up, and the contention certainly has no foundation in reason or justice. No rights vested in the upland owner in virtue of these acts that he did not possess before."

The extent to which a riparian owner may go in adding to his land is indicated in *State of Kansas v. Meriwether*, 182 F 457 (8th Cir.). In that case, although the court agreed that "a riparian owner along a navigable stream cannot fill out his bank with dirt or debris taken from the shore and thus encroach upon the bed of the stream belonging to the public and thereby secure title by accretion," it held that the upland owner has the right to accelerate and confine deposits to his land as long as "the proximate cause of the restoration be the deposits of sand and dirt brought down by the current of the river." The reason behind this distinction may be the difficulty of building a protecting embankment which will accurately maintain the status quo by preventing erosion (which an upland owner has a clear right to do) and yet not add to the land by causing new deposits. See *Brighton and Hove General Gas Co. v. Hove Bungalows, Ltd.*, supra.

*State v. Gill*, 259 Ala 177, 66 So2d 141, ventured an interesting distinction between the situations when an artificial change will and will not change title. There, the federal government had dredged a channel in Mobile bay and had deposited the spoils from the operation in front of the upland owner's property. In holding that the land went to the riparian owner as against the state, the court relied largely on the Lovingston case, supra, and, while agreeing that this was not a gradual accretion, termed it a "streamlined accretion."

It pointed out that the basic reason for such divergence from the gradual-sudden distinction was based on the policy of encouraging "man-made" additions in Mobile bay, from which the state would ultimately benefit by increased commerce. The case appears to stand alone in making the distinction.

The contrary view, that artificial changes caused by third persons will not change title, is represented by *Barakis v. American Cyanamid Co.*, 161 F Sup 25 (U S Dist Ct, N D Tex). In that case the court held that the plaintiff was not a riparian proprietor and had no right of irrigation by the use of the water of a near-by river. It stated:

> "* * * some of plaintiff's agricultural tracts cannot be riparian lands; those 'man made' acres along the 'man made' river channel, and those acres separated from the artificially constructed channel by the artificially made land, lost their riparian characteristics. * * *"

It held that the addition to the soil came under the doctrine of avulsion.

In *Lorino v. Crawford Packing Co.*, 142 Tex 51 175 SW2d 410, the plaintiff claimed title to "dry land" built up by throwing oyster shells from a pier, thereby causing sand to form around them and raise the land above the water. The court held that no boundary change had been effected. It stated that:

> "* * * It is undisputed that the land under the pier was covered with navigable waters when taken possession of by Stapp. The evidence shows that the process of changing the submerged land into uncovered or dry land was caused by the acts of Stapp and his successors by the use of artificial means, and was not the result of the process of gradual additions caused by the the natural flow of the tide washing sand upon the shore; that is, it

is not an accretion resulting from natural causes unifluenced (sic) by artificial means. For this reason the accreted land belongs to the State, and not to the owner of the contiguous land. Accretions along the shores of the Gulf of Mexico and bays which have been added by artificial means do not belong to the upland owners, but remain the property of the State. * * *"

California has very strongly adopted the view that the source of the change is material in the application of the rule. In part, this may be explained by the California statute, Civil Code § 1014, which, in speaking of accretion on rivers, uses the term "natural causes," and by Article 15, § 3 of the California constitution which forbids the grant or sale of tidelands within two miles of a city. *City of Los Angeles v. Anderson*, 206 Cal 662, 275 P 789, summarizes the earlier cases. In considering the claim of the city to tidelands formed by a breakwater, that is, a gradual artificial accumulation, the court stated:

"At common law, when land was from natural causes and by small and imperceptible degrees gained from the sea or formed upon the banks of rivers and streams, either by alluvion or dereliction, it belonged and went to the owner of the upland or of the bank, respectively. (2 Blackstone's Commentaries, 262.) Section 1014 of our Civil Code definitely applies this common-law principle to rivers and streams situate within our state boundaries, but the section contains no express reference to the rule of alluvion as it affects the seashore. However, this court, in the case of *Strand Imp. Co. v. Long Beach*, 173 Cal. 765, 770-773 [161 Pac. 975, 978], declared that the failure of the section to treat of alluvion forming upon the seashore did not warrant an inference or conclusion that the common-law rule had been, to that extent, abrogated in this state * * *. The right of the upland owner to additions to his land by alluvion, where the land abuts

upon the ocean, as recognized in the early case of *Dana v. Jackson Street Wharf Co.*, 31 Cal. 118, 120 [89 Am. Dec. 164], was thereupon affirmed * * * Where, however, the accretions have resulted, not from natural causes, but from artificial means, such as the erection of a structure below the line of ordinary high water, there is made out a case of purpresture, or encroachment, and the deposit of alluvion caused by such structure does not inure to the benefit of the littoral or upland owner, but the right to recover possession thereof is in the state or its successor in interest, as the case may be. [Citing cases]."

While the court spoke of "purprestures," i. e., a structure illegally below high water mark, the breakwater which created the accretions in the case was a government breakwater, and therefore legal. Nonetheless, the court held that title was in the state's successor, the city. Similarly, in *Patton v. City of Los Angeles*, 169 Cal 521, 147 P 141, where the artificial accretions were caused by a lawful railroad embankment, the upland owner was denied any title to the accreted lands. The court commented:

"* * * We can see no plausible reason for the contention that the making of such embankments, or accretions caused thereby, would operate in favor of third persons to divest the state of its title to tidelands covered by the embankment and accretions extending out over it from the adjacent upland, and transfer the title to the owner of the upland. * * *"

Cf. *Koyer v. Miner*, 172 Cal 448, 156 P 1023, which held that the upland owner can not complain of a loss of access to the water when a railroad embankment preventing such access is constructed under a lease from the city to facilitate navigation.

In *Carpenter v. City of Santa Monica*, 63 Cal App 2d 772, 147 P2d 964, the plaintiff, as upland owner,

claimed that sand deposited by the waves of the ocean in the course of many years upon a beach in front of his property constituted accretions and belonged to him. He sought damages which resulted from the later construction by the city of a breakwater which altered the movement of the water and caused the beach to erode. The court found that in a state of nature the beach was in equilibrium and would have continued so indefinitely if no man-made structures had been constructed. It found, however, that before the accretions, which the plaintiff claimed, had begun to form, piers, wharves and groins had been erected near by and that they changed the ocean current causing the sand to pile up gradually over the years. In that way, according to the court, the extensions to the beach, which the plaintiff claimed, were created. Still later the city built the breakwater of which the plaintiff's suit complained and thereby the course of the current was again changed with the result that the accretions gradually eroded. Thus, the legal problem which the case presented was ownership of the accretions which were caused by the wharves, piers and groins. After announcing that "the rule in this state is that in a controversy between the state, or its grantees, and the upland owner, artificial accretions belong to the state, or its grantees, as the owner of the tidelands," the court continued:

> "From these cases it must be accepted as settled in this state that accretions formed gradually and imperceptibly, but caused entirely by artificial means—that is, by the works of man, such as wharves, groins, piers, etc., and by the dumping of material into the ocean—belong to the state, or its grantee, and do not belong to the upland owner. * * * If accretions along an entire bay caused by the construction of a pier or wharf were held to belong to the upland owners as against the state, or its grantee, it would mean, in some cases, that the

power of the municipality to improve its harbor would be cut off unless the accreted areas were condemned. It would mean that every time the state or its grantee determined to build a wharf or pier, or to grant a permit or franchise for such construction, it would be granting away a material portion of the tidelands along the entire bay that might later be covered by artificial accretions. Such a rule would mean that the state or its grantee could thus grant into private ownership tidelands which it holds under an irrevocable trust. Such rule would permit the state or its grantees thus indirectly to convey away these tidelands, held in trust, when it cannot do so directly. * * *"

The rule developed in these cases has been applied as well in the case of filled-in land. In *City of Newport Beach v. Fager*, 39 Cal App 2d 23, 102 P2d 438, the court stated:

"All of the evidence relating to the character of the major portion of the land in question shows that it is artificially filled tide land. There is therefore no merit in the argument of defendants that such land is to be treated as an accretion to which they, as the respective upland owners, are entitled. In order for a littoral owner to be entitled to accretions which may form upon the upland, such accretions must have been the result of natural causes and must have been formed gradually and imperceptibly. * * * Accretions which have been added to the upland by artificial means do not inure to the benefit of the littoral owner but remain in the state or its successor in interest. * * *"

We also note that California recognizes the doctrine of avulsion; in *Bohn v. Albertson*, 107 Cal App2d 738, 238 P2d 128, where a levee broke and flooded reclaimed land, the court held that the title to land inundated remained in the owners, though the public had a right of navigation until the land was reclaimed.

The Oregon cases seem to hold that the artificial origin of accreted land does not affect the rule that the boundary follows the water; but, as will be pointed out later, the question has been left open where the rights of the state are involved. The concept was considered in *Hanson v. Thornton*, 91 Or 585, 179 P 494, which involved the title status of land uncovered by the reliction of a navigable lake. However, since the change was found to have resulted from natural causes the statement of the court on the subject must be considered as dictum. After the decision had declared that accretion and reliction are governed by the same rules, it went on to say that:

> "The contention that the reliction must result purely or largely from natural causes, must be received subject to many restrictions. One who purchases land abutting upon a lake or watercourse, usually considers his right of access to such waters as an element of value in the purchase. When we speak of riparian rights, we are not considering a mere shadowy privilege but a substantial property right, the right of access to and a usufruct in the water. To say that the owner of such a right may without his consent be deprived of it by the state or the general government permitting some other person to obtain title to the accretion formed by an impounding or diversion of part of the waters that previously washed the shore of his land, does not appeal to our sense of justice and we do not believe that the authorities generally support such a doctrine. Mr. Gould, speaking of the rule of accretion, says:
>
> " 'In general it applies to artificial ponds as well as to natural waters, and to changes made by artificial as well as natural causes, if the artificial cause is not itself unlawful and the gradual acquisition of the new soil results from the exercise of lawful rights of property and not from operations tending or intended to produce the change': Gould

on Waters, § 155; *Adams v. Frothingham*, 3 Mass. 352, 362. (3 Am. Dec. 151); *County of St. Clair v. Lovingston*, 23 Wall. 46-66 (23 L. Ed. 59).

"But even were it conceded that a reliction caused by artificial diversion of streams emptying into a lake and thereby diminishing its water supply, would not accrue to the riparian owners of the adjacent bank, the evidence is not sufficient here to establish the fact that the recession of the waters of Goose Lake is due to that cause."

In *Tomasek v. Oregon State Highway Commission*, 196 Or 120, 248 P2d 703, highway construction had so narrowed a stream that the force of its flow washed away the top soil of plaintiff's land. The artificial aspect of the question was not specifically considered, but the court found that the erosion was "abrupt, sudden and artificial." It, therefore, held that the erosion did not change the stream's boundary. Thus, the decision seems to have adopted the gradual-sudden distinction, without placing much reliance on the artificial aspects. It held that the upland owner was entitled to compensation from the state.

The basic Oregon rule was laid down, at least as between private parties, in *Gillihan v. Cieloha*, 74 Or 462, 145 P 1061. The case involved a dispute between two landowners over title to a filled-up channel between two islands. The channel, formerly navigable, was filled up when a federal dike was built at its upstream end and dredged material from another channel was thrown over the dike as waste. Thus, the filling was due in part to accretions caused by the changed flow of the water and in part to the "sudden" dumping of material into the water. In holding that the accretions went to the upland owner, the court stated:

"* * * As against everyone but the state, concerning the rights of which we express no opinion,

> plaintiffs are the owners of any artificial extension of the land caused by dumping or pumping sands against the bank. The law zealously guards the right of a riparian owner to have access to the stream upon which his land is situated; and while the right of the government of the state to artificially extend the banks, as was done in this instance in the interest of commerce, is paramount, we are disposed to hold that, in the absence of any assertion of title or possession by the state or the general government, such extension accrues to the shore owner."

It is difficult to discern from the opinion whether the court would have favored the state or the upland owner as to all of the increase, or whether it would have made some distinction as to land formed by the action of the water and the land formed by direct fill. In view of the other authorities which we have cited we tend to think that it might have done the latter, allowing the upland owner to take only the water-carried accretions.

It is apparent from the foregoing cases that most of them concern the addition to, and not the loss from, land of a riparian owner. Various reasons have been assigned by the courts for the doctrine of gradual accretion, as we have seen. Among them are these: (1) the increase is too minor to be worth notice by the law, (2) the rule is founded on the principle of compensation for loss, (3) since the increase is so minute that it is unascertainable it will, therefore, be deemed not to exist, and (4) the rule encourages improvement by the person best able to use the land. These reasons are perhaps more compelling when they are applied to explain the rule with respect to changes in boundaries between private riparian owners along a stream than to changes in boundary against the state, but they have been asserted with equal force in both situations. A

more cogent reason which, outside of the Oregon cases, is seldom expressed is the desirability of keeping riparian property riparian. As pointed out in the Hanson and Gillihan cases, supra, this is an important part of the value of such land.

For our present purposes we may agree with the idea that gradual artificial accretions go to the upland owner when caused by the acts of third persons and, in some cases, such as *State of Kansas v. Meriwether,* supra, by the acts of the upland owner himself. We agree with the doctrine that a riparian owner cannot add to his property against the state by filling in the area adjacent to his property, either on the idea that such a change is sudden and therefore an avulsion, or on the idea that he cannot thus claim that to which he has no right. Once we have accepted this latter concept, it seems only logical to bring into play the "compensation" concept, in what we think is its proper order of presentation, and hold that sudden artificial changes, such as dredging by the upland owner, do not work a change in his boundary. Several cases have held that a sudden artificial reduction does not change the boundaries.

*Whiteside v. Norton,* 205 F 5 (8th Cir, 1913), appeal dismissed, 239 U S 144, 60 L Ed 186, 36 S Ct 97, involved the question of the effect on the boundary between private parties (which was also the state boundary) of the dredging of a new channel. The court held that the dredging was analogous to an avulsion and therefore did not work a change in the boundary. *James v. State,* 10 Ga App 13, 72 SE 600, held that the criminal jurisdiction of the state of Georgia was not affected when the main channel of a river between Georgia and South Carolina was changed by federal

dikes and dredging. While relying to a large extent on the necessity for permanence of state boundaries, the court reviewed the doctrines of accretion and avulsion and concluded that the legal effect of this change was akin to that of avulsion. Contrary to these holdings is the case of *Maufrais v. State*, 142 Tex 559, 180 SW2d 144. There, the upland owner had made several excavations on his property near the river channel. During a period of high water, the river broke into these excavations and created a new channel. The court agreed that normally accretion changed the boundary but that avulsion did not. However, it also pointed out that under the Texas rule (which a comment in 31 Tex L Rev 312 asserts is different from that of all of the other states) where a river shifts by avulsion the land under the new channel goes to the state and the old bed goes to the upland owner. Thus, the court continued:

"* * * It logically follows that where a navigable river by avulsion cuts a new bed in addition to its old bed, and part of the normal flow of such river flows through such new bed, [the owner loses title to the new bed]."

While the state certainly has the power to prevent interference with the navigation of a river, it has no power to prevent a beneficial use of the upland when that use does not interfere with either public or private rights. In *United States v. Turner*, 175 F2d 644 (5th Cir), the majority held that filling land originally submerged did not change the boundary of the land and agreed with the dissenting opinion in urging that artificial dredging did not deprive the owner of his title, as follows:

"I take it also to be the law that where title to land was acquired by accretion the land belongs as thoroughly to the upland owner as if he had bought and paid for it from the true owner, and that as

owner of the title he may put the land to its highest and best use. For instance, he could dredge it out and make a yacht basin wherein to rent space to yacht owners. By thus utilizing his land he would not forfeit it to the State. He could fill up his basin at any time that he wished to change the use, and in filling it up he could accept ship ballast or spoil from federal dredging and thus reclaim that which was already his. By the same taken (sic), Turner, a shipper of lumber, could construct a wharf on his land for shipping lumber and then dredge out the soil so that vessels could reach it. Putting his land to use was not an abandonment, an avulsion, nor an erosion that changed its boundary or title. By the same right that he put his land to its best use he could change that use and reclaim it artificially or otherwise. In other words, the adaptation of his land to this very substantial purpose by the expenditure of large sums in dredging and building a wharf * * * is the exact opposite of an abandonment and has no relation to erosion, avulsion, or any other similar process of title or boundary involvement.

"If it be true that Turner once had title to these lands, he will not lose same by his dredging or by any method known to the law * * *."

We conclude our review of the authorities by taking note of an opinion rendered to Mr. E. T. Pierce of the state land board by the attorney general and found in 26 Ops Atty Gen 167. The issue involved was the power of the state land board to lease a privately dredged navigable channel between two tidal rivers. After stating the general rules of ownership and accretion and pointing out that an avulsion does not affect boundaries the letter continued:

"If, upon a sudden and violent change of the course of a stream, an owner's land is covered, the title in the bed of the new stream or channel exists as before, and likewise the state's title to the bed of the old stream. The artificial dredging of the

instant channel is analogous in its effect to the avulsive alteration of the channel or course of a river and has no effect upon the boundaries of the upland or on the riparian owner's title to the bed of the new channel: Gillihàn v. Cieloha, (1915) 74 Or. 462.

"Consequently, the state of Oregon does not own the bed of the artificially created channel, nor the banks thereof which are affected by the tide; and specifically, the state land board has no power to lease the same."

See also 20 Ops Atty Gen 528, holding, in accordance with the general rule, that title to lands below high water mark can not be acquired as a result of dredging operations by which the surface is raised above ordinary high water mark.

 Whether we call it an "avulsion" or simply set down the rule that a riparian owner does not change his boundary when he makes a use of his land which results in a sudden recession of his bank as a corollary of the rule that he can not add to his land by suddenly filling out from the bank, we are satisfied that any area which now exists at the defendants' log dump which is covered and uncovered by the tides is not the property of the state. As long as an upland owner does not encroach on the rights of the state (and we have determined factually that there were no tidelands at this spot when the bank was dredged away) or of other parties, he may make artificial changes in his bank which will not destroy his title or affect his boundary.

Finally, since the laws of this state and those of Washington affect their common boundary, the Columbia river, another consideration should be uniformity, where possible, of the law of our two states. While riparian rights have been limited in Washington (*Bilger v. State*, supra; *Eisenbach v. Hatfield*, 2 Wash

236, 26 P 539), the conclusions we have reached find support in *Washougal Transportation Co. v. The Dalles, P. & A. Nav. Co.*, supra, which is reviewed in a preceding paragraph of this opinion.

Since this is a test case, we analyzed in the preceding paragraphs virtually all of the contentions submitted by the parties. As we have said, we are satisfied that although the tides, according to Mr. Warfield's drawing, visit a part of the log dump no part of the property is owned by the state. For the sake of completeness a preceding paragraph assumes that the strip in question is tideland within the contemplation of ORS 273.010 (6), but holds that since the state has no present use for the strip and the defendants' use of it, as upland owners, does not interfere with navigation, the state is not entitled to any relief. It must be born in mind that our assumption in that paragraph of state's ownership of the strip is only a hypothesis for the purpose of resolving the issue. We are entirely satisfied for the several reasons above given that the defendants, and not the state, are the owners of the locus in quo.

In view of the fact that the circuit court found that tidelands exist at the locus in quo but held that the state had lost control over them, that decree should be and is hereby vacated. The cause is remanded to the circuit court with instructions to enter a decree for the defendants in harmony with the above views.