Argued May 19, affirmed August 5, 1954

# GUBSER ET UX. *v.* TOWN ET AL. and STOUTENBURG ET AL.

273 P. 2d 430

*J. Ray Rhoten* argued the cause for appellants. On the brief were Rhoten, Rhoten & Speerstra, of Salem.

*Francis E. Marsh* and *Willard L. Cushing,* of Mc-Minnville, argued the cause for respondents. With them on the brief were Marsh, Marsh & Dashney, of McMinnville.

Before WARNER, Acting Chief Justice, and ROSSMAN, TOOZE and PERRY, Justices.

ROSSMAN, J.

This is an appeal by David C. Town, George Hill, H. W. Black and H. E. Harris, four of the six defendants, from a decree of the circuit court which adjudged that the plaintiffs, husband and wife, are the owners of a tract of land which the decree describes, and which enjoined the defendants from entering upon or trespassing over the tract. In addition to awarding the plaintiffs the relief just mentioned, the challenged decree granted the plaintiffs judgment against the defendants in the sum of one dollar as damages for past trespasses. The tract of land which is described in the decree is approximately 42 acres in extent and is situated in Yamhill county.

The appellants submit the following assignment of error:

"The court erred in declaring, determining and decreeing that the respondents were owners of the property described in the decree and enjoining the appellants and defendants from entering upon the land described therein and which embraces the land in question, where the appellants' duck blind was situated."

The land with which this suit is concerned is located in the northerly part of Grand Island. The latter lies in the Willamette river. The island is bounded upon the east and south by the Willamette river. Lambert slough, an arm of the river, affords the island its other boundaries.

The brief of the appellants contains a map of the tract which is the subject matter of this suit and of the area immediately adjacent to it. Although the map was not drawn with the technical skill of an engineer, it affords a useful impression of the area with which the suit is concerned. A copy of the map appears on page 1247.

By looking at the map it will be observed that it contains a representation of the present course of the Willamette river and that to the left of that representation is an indication of where the river flowed in the year 1852. The land east of Lots 2 and 13 and lying between the present channel and east of the west bank of the old channel is the area in dispute. The following map identifies the area with the designation, Lot 1. Since the middle of the main channel of the Willamette river is the dividing line between Marion and Yamhill counties (§ 85-135, OCLA: ORS 201.240), the area which is known as Lot 1 lay in Marion county when the river occupied its old, or 1852,

channel. When the river cut and then flowed through its present channel, the land in question became a part of Yamhill county.

The map designates four areas with the symbols, Lot 9, Lot 13, Lot 3 and Lot 2. Those areas constituted the John Largent Donation Land Claim. The patent designated them with the symbols which we just employed. The respondents are now the owners of those four lots—as the appellants concede. The westerly line of Lots 9 and 3 is the easterly line of Lambert slough.

The respondents claim that they are the owners of Lot 1 by (1) accretion to the John Largent Donation Land Claim; (2) adverse possession; (3) a decree which the circuit court entered in a suit instituted by the respondents to quiet title to Lot 1 and in which the appellant Town was a party defendant; (4) a deed from one Opal Mary Mahoney, to whom we will later refer; and (5) a deed from the defendant Roy Stoutenburg which we will mention later. The appellants rest their claim to possession upon two purported leases, and urge that the respondents "can only prevail upon the strength of their own title and not upon the weakness of any title of the appellants or defendants." The appellant Town claims that he obtained a lease from Opal Mary Mahoney authorizing him to hunt upon the property in question. The document, if any, which evidences the purported lease was not produced during the trial and the record contains no information about its terms. The other alleged lease came from the State Land Board in 1950. It names as lessee the defendant-appellant David C. Town. It describes the leased premises in this way:

"All overflow land lying between mean low and mean high water lines fronting and abutting Lot 1, Section 10, Township 5 South, Range 3 West Willamette Meridian."

It mentions no county. Its term is five years.

By returning to the map it will be observed that upon Lot 7 there appears the name Stoutenburg. The defendants Roy Stoutenburg and Raymond Palmer own the land known as Lot 7. They were made defendants for the reason that they assisted the appellants to erect the duck blind which is indicated upon the map. They are not appellants.

Opal Mary Mahoney, whom we have mentioned, together with her husband, owned Lot 1 when the river flowed through the channel which the map identifies as the 1852 channel.

We have mentioned the fact that the respondents own Lots 2, 3, 9 and 13 and that those parcels were part of the John Largent Donation Land Claim. That land claim, as the appellants admit, was acquired by John Largent in 1866 when the Federal Government issued a patent to him. The original government survey of the area with which we are concerned was made in 1852 and it showed that the east boundary of Lots 2 and 13 was the meander lines of the Willamette river. Accordingly, it appears that when the land was first surveyed it was riparian land. *Jefferis v. East Omaha Land Co.*, 134 US 178, 33 L ed 872, warrants a holding that accretions to the land between the date of the original survey and the date of the patent passed to the patentee even though the description was by lot number.

We now quote from the appellants' brief:

"* * * in 1944 or 1945, the respondents herein instituted suit to quiet the title to the accretions to the John Largent Donation Land Claim and appellant Town was made a party to such suit. That matter was determined and Opal Mahoney executed and delivered her quitclaim deed to the respondents, the description of which reads as follows:

" 'All of the Donation Land Claim of John Largent, Notification No. 3894, in Sections 3 and 10 of Township 5 South, Range 3 West of the Willamette Meridian, in Yamhill County, State of Oregon, together with all accretions to said Donation Land Claim. Said land being further and more particularly described as follows, to-wit: Beginning at the Southwest corner of Lot 2 in Section 10 of

Township 5 South, Range 3 West of the Willamette Meridian, in Yamhill County, Oregon, and running thence South 89° 26' East to the low water mark on the West bank of the Willamette River, and thence following the low water mark on the West bank of said river to the confluence of said river with a slough that accomplishes the formation of Grand Island, which is approximately near the North line of said Section 10; thence northerly following the westerly margin of said slough to the Northeast corner of Lot 13 in Section 3; thence West on the North line of Lots 13 and 9 of said Section 3 to the center of said Willamette Slough; thence southerly along the center of said slough to the southwest corner of Lot 3 in Section 10 in said Township and Range; thence East on the south line of Lot 3 to the place of beginning, containing 207 acres, more or less, save and excepting therefrom 3.25 acres conveyed to Yamhill County, Oregon, for a county road.'

"Subsequent to the giving of the quitclaim deed by Opal Mahoney to the respondents, the appellants, through Mr. Town, obtained from the State of Oregon a lease to the following described property:

" 'All overflow land lying between mean low and mean high water lines fronting and abutting Lot 1, Section 10, Township 5 South, Range 3 West Willamette Meridian.'

and such lease is still in force and effect.

"In about 1934, there was some contention between the respondents and defendant Stoutenburg as to the southerly portion of the land in question and defendant Stoutenburg and his wife executed and delivered to the respondents their deed to land described similarly to that of the Mahoney deed. Each of the deeds referred to and the decree in the suit to quiet title purported to describe the accretions to the John Largent Donation Land Claim and running to either the high water mark or the low water mark of the Willamette River.

"Subsequent to the appellants' obtaining the lease from the State of Oregon, the appellants erected upon the land in question a duck blind which is designated by an 'X' on Defendants' Ex. 31 about ¾ inch above the letter 'O' in the designation 'Lot 1', also see sketch, supra, and erected slightly north of such duck blind a fish trap as shown on Defendants' Ex. 5.

"Thereafter, various contentions and claims were made with respect to the ownership and right of occupancy of the land in question which resulted in the respondents' instituting their suit for an injunction to enjoin and restrain the appellants and defendants from any possession of the land in question, and for damages. Thereupon, the appellants and defendants denied that they had entered upon land of the respondents and issue was joined.

"It is admitted by these appellants that the respondents are the owners of and entitled to possession of Lots 2 and 3 in Section 10, and Lots 9 and 13 in Section 3, Township 5 South, Range 3 West of the Willamette Meridian in Yamhill County, Oregon, *together with the accretions thereto*. It is the appellants' contention that the respondents are not the owners of the land in question either by way of accretion, grant or adverse possession."

Much time was consumed during the trial with the presentation of evidence showing whether or not Lot 1 as now constituted, including the old river bed, is dry land and whether or not through the process of accretion that land has become a part of Lots 13 and 2; that is, of the property which the appellants admit the respondents own. The parties agree that the Willamette river as it flows through Grand Island is a navigable stream and that the rights of riparian owners extend to its low water mark.

The evidence upon the issue of accretion went back to the conditions as they existed in 1852. At that early

day the Willamette river flowed in the channel which is indicated upon the above map. Some of the witnesses recalled the steamboats which plied in that channel. They mentioned boat landings and grain warehouses which were in use in the days of river transportation. Ultimately a change in the course of the channel began to manifest itself. In 1891 flood conditions prevailed and all of Grand Island was submerged. When the water resumed its normal level it was seen that the river had begun to cut a new channel in the area with which this suit is concerned. Since the evidence upon that phase of the case came from men whose years are advanced and whose recollections had to recede a half century, it is imperfect in parts. Adding to the difficulties is the fact that the witnesses who described the shift in the river's channel and the subsequent deposit of alluvion, in using maps, pointed to "here" and "there", but, with a single exception, failed to make any mark upon the maps whereby we can locate the places to which they referred. This part of the record abounds in the reporter's notations of "indicating." The situation parallels *McAdam v. Royce,* 202 Or 245, 272 P2d 986, 274 P2d 564. The evidence, however, shows clearly that the river did not suddenly abandon its old course and cut a new one. About ten years passed before the river settled into the passage which it now employs. In the interim it cut a third passageway. That occurred in 1895 or 1896, but two or three years later it left that one. For sometime the river flowed through the old channel and the present one. During a part of the time that the river was making its transition from the 1852 channel to the present one, the area which we have identified as Lot 1 disappeared from sight. It was submerged by the water of the river. Before long a gravel bar emerged which could be seen

when the water was at low stage. It is impossible to determine from the record the place where the gravel bar came into view, for the witnesses, in testifying upon the subject, spoke of "here" and "there". After the gravel bar appeared, willows began to grow upon its surface.

It is clear that the gravel bar mentioned in the last paragraph is now a part of Lot 1, although soil and vegetation cover its gravel. The small bar which managed to find its way to the surface a half century ago has become integrated with the area to the west. Even the old channel of the river has become absorbed in the surrounding tracts and scarcely a trace of it remains. The area, which a few years after 1891 was submerged, now stands above the level of the Willamette from about May 1 to the latter part of September. Some years it is dry for even a longer period. Large trees now grow upon Lot 1 and at the time of the trial 23 head of cattle were finding good pasturage upon it. For many years sheep, cattle and horses have grazed upon it. An embankment, irregular in height, runs parallel to the area's easterly side. The evidence does not disclose the origin of the embankment. From its top one walks about 100 feet or so to the water's edge.

With the coming of the freshets in the fall, the livestock which grazed upon Lot 1 in the summer is removed. Presently water backs upon the lot from a depression in the north which is perhaps the vestige of an old channel. When the water in the river becomes particularly high, it overflows the embankment which we have mentioned. Water is seemingly no stranger to Grand Island, and all of the latter at times has been flooded. The duck blind which the defendants con-

structed is several hundred feet from the river and in the summertime is surrounded by dry land.

Witnesses spent much time in describing the manner in which alluvial deposits have settled upon Lot 1 until it is now dry land during many months of the year. They spoke of the deposit of sediment which the freshets annually bring to the area. One of them thought that Lot 1's level is raised about a half inch each year. The line fence between Lots 2 and 7 which was built some years ago is now underground for part of its distance. A dredger which deepened the river in order to adapt it better for navigation brought the level of the island even further above that of the stream. A wing dam which the United States Army Engineers built in the river adjacent or near to Lot 1 has caused the sediment to settle more readily in that vicinity.

The appellants claim that it was the gravel bar, and not Lots 2 and 13, which accreted until it finally embraced them. The respondents contend that sediment was constantly deposited upon the water line of Lots 2 and 13 and that it was those areas which accreted.

The evidence would afford scant support for a surmise that the gravel bar, which appeared above the surface after the river had settled in its present channel, accreted materially. From the record, the bar vanishes as effectively from view as it emerged from the depths of the channel about 1900. It is impossible to ascertain what became of it. It is true that it developed a growth of willows and that a wing dam was built upon or near to it, but after those facts had been mentioned the gravel bar passed from the witness stand's ken. Upon the other hand, the record indicates with clarity that the river gradually, but constantly, made deposits upon the water's edge of Lots 2 and 13.

No less a person than the defendant Stoutenburg swore to that effect. He traced the deposits of alluvion which he said occurred first upon Lot 7 and then extended northerly over Lots 2 and 13. He showed how, over the years, the dry land which is now Lot 1 succeeded to the water which previously flowed there.

The evidence renders it clear that the Willamette, for many months of the year, carries quantities of silt and other material. When the water with its contents of alluvion backs up on Lot 1 the sediment is deposited there. One witness spoke as follows:

"When that water gets up, all the water for miles across there is full of sediment, it is loaded full of silt, and when the water goes down that silt deposits on the land. Now, this land is flooded from this direction usually. That silt-laden water backs up over this, so that when this whole country is flooded this silt-laden water is there and backs up over this, then as the water recedes and fades away, all that silt just drops. That's the way that this built up."

Seemingly, after the river settled into its present channel, its old passageway gradually became filled with alluvial deposits. As willows, ash and cottonwoods grew where water at one time had flowed, the deposit of the alluvion was quickened.

For further analysis of the evidence, we adopt the memorandum opinion of the able trial judge. He had the benefit which came, not only from seeing and hearing the witnesses, but also of observing them while they used the maps and pointed to "here" and "there". Further, he twice visited Lot 1. His first visit was made in November of 1951 when he ruled upon the motion for a dissolution of a temporary restraining order which he had previously issued. His second visit

was made in June, 1952, before he passed upon the merits of the case. The memorandum opinion, by the appellation "plaintiffs", refers to the same two persons whom we have spoken of as the respondents. By the term "defendants" it means, not only the four appellants, but also Stoutenburg and Palmer who did not appeal. Before quoting the part of the memorandum opinion which is concerned directly with the issue of accretion, we will resort to the following preliminary paragraphs and then pass directly into the passages which dispose of the issue of accretion:

"In addition to their claims of said property by virtue of alleged accretions, plaintiffs alleged and proved that title to all accretions was conveyed to plaintiffs by deed from Roy E. Stoutenburg and Rose C. Stoutenburg on the 31st day of May, 1934, said grantors being adjoining land owners; and by deed from Opal Mary Mahoney dated August 27, 1945, said grantor being the owner of what was formerly said Lot 1, which title was confirmed by a decree entered in the Circuit Court for Yamhill County on the 27th day of August, 1945, in a suit to quiet title to the lands which plaintiffs contend accreted to their property, the parties in that suit being the present plaintiffs as plaintiffs therein and D. Clint Town, Opal Mary Mahoney, Edward Richards and Neva Richards, defendants.

"The controversy in the instant case arises from defendants going upon the lands which have been built up between the west bank of the Willamette River as said river was located prior to 1890 and the west bank of said river as it is presently located and defendants' asserted claim of right to go thereon through a lease from the State of Oregon and a permit to maintain a fish weir received from the United States Department of Engineers.

"By reason of the allegations set forth in the plaintiffs' complaint with which the defendants join

issue the following questions present themselves for determination, to-wit:

"Is the land in question a true accretion to plaintiffs' property?—if so, plaintiff would own said property to the low water mark of the Willamette River as it flows in its present course.

"If the land in question is not a true accretion it would become necessary to determine whether such land was located above or below the high water mark—if it be determined to be located below the high water mark it would belong to the state and the plaintiffs would not be entitled to the relief prayed for in their complaint.

"If on the other hand the land in question is not a true accretion but is located above the high water mark of the present bed of the Willamette River it would become necessary to determine whether the description in the deed hereinabove referred to from Mahoney to plaintiffs covers the land in question, or whether such deed covers only the Largent donation land claim and accretions thereto.

"After a careful consideration of the briefs submitted by counsel for the respective parties and a careful consideration of the evidence offered both upon the preliminary hearing as well as upon the trial of the matter on its merits, together with the observations made by the Court when the Court in company with counsel and the parties inspected the premises in question during a freshet in November of 1951, during which it was necessary to use a boat to go upon much of the land in question, coupled with the Court's observations when the Court again inspected the property in company with counsel and the parties on the afternoon and evening of June 6th of this year, the Court has reached the conclusion that the land in question is located above the high water mark of the present bed of the Willamette River. The Court has reached the above conclusion not only from a consideration of the nature and type of the soil and the vegetation on

said land as the Court observed the same upon the above-mentioned two inspection trips, but likewise from a consideration of the fact that during the present season as well as the past season, and for many years prior thereto, said land has been pastured by cattle or sheep during the months from May to October.

"It would appear to the Court that the description in the deed from Mahoney to plaintiffs hereinabove referred to, while it leaves much to be desired, is sufficiently definite and certain to enable one to locate the boundaries of the property therein described by metes and bounds, and that such metes and bounds description includes, among other properties, the property in question in this suit. Having concluded that the property in question is covered by the Mahoney deed and having concluded that such property is above the high water mark of the present bed of the Willamette River, it follows that plaintiffs would be entitled to the injunctive relief sought, wholly aside from the question of plaintiffs' right thereto based upon their contention that said property accreted to the John Largent donation land claim which they own.

"While no purpose would be served by an extended discussion of the evidence by way of explaining the basis of the conclusions hereinabove reached by the Court, it might be pointed out in passing that Mrs. Mahoney in the suit to quiet title hereinabove referred to was represented by able counsel in the person of Mr. Ralph Moody of Salem, and subsequent to the institution of the suit to quiet title hereinabove referred to in which Mrs. Mahoney, Mr. Moody's client, was named as a defendant, the conveyance in question was given. Such conveyance would have been an idle gesture if the parties thereto had not intended to cover the land in question, whether such land be an accretion to plaintiffs' property or otherwise—obviously Mrs. Mahoney as well as Mr. Moody considered that Lot 1 had been destroyed by the action of the Willamette

River and had accreted to the plaintiffs' property, and Mrs. Mahoney subsequent to the giving of said deed has never questioned the plaintiffs' right to said property.

"In resolving the proposition as to whether the property in question is an accretion to the Largent donation land claim it becomes necessary to determine how the property in question came into being, whether by a gradual and imperceptible addition to the Largent donation land claim to the west as contended for by plaintiffs, or whether the property in question came about as a result of a sudden change in the course of the river resulting in the formation of an island between the former bed of the Willamette River and the present bed of the Willamette River, with such island gradually building up until it eliminated all water separating the said island and the Largent donation land claim to the west, as contended for by the defendants.

"A fair consideration of the evidence, in the opinion of the Court, compels a conclusion somewhat between the above-mentioned propositions. The testimony of the witnesses produced by the plaintiffs, which were the only witnesses offered upon the subject, leaves no question but that a change in the course of the river occurred sometime between 1890 and 1900, and while three disinterested gentlemen, of necessity advanced in years, testified as to their recollection of occurrences approximately sixty years ago as they remembered them, of necessity their recollections were not as distinct and definite as a trier of the fact would wish them to be. However, it would appear to the Court that a fair consideration of such testimony would indicate that probably during the extremely high water in 1893, during which a general flood condition prevailed on Grand Island, the Willamette River in the vicinity of the property in question overflowed its banks and washed a channel where the present bed of the Willamette River is now located, and that for a number of years

subsequent thereto part of the water of the Willamette flowed in the present channel of the Willamette River and part of the water of the Willamette flowed in the channel of the Willamette River as it existed prior to 1893, and that the entire land between said two channels for a time, probably two or three years, was submerged. This contention is supported by the testimony of witnesses that two steamboats had a race, one following the new channel and one following the old. It would appear to the Court that when the ground between the two river channels first emerged after an appreciable time it appeared as a gravel bar, and this gravel bar gradually grew and its growth was enhanced by the construction of a wing dam, and that over the years the area between the present channel of the river and what was formerly the east boundary of the Largent donation land claim gradually built up, until sometime prior to 1941 portions of it became suitable for pasture, and that through the years it has gradually developed, until today all or substantially all of the ground lying between the high water mark of the present course of the Willamette River and the former east boundary line of the Largent donation land claim (the west bank of the Willamette River as it was located prior to 1890) is suitable for pasture purposes. In the light of the above conclusions it would appear to the Court that the property in question constitutes an accretion to the property of the plaintiffs, and that by virtue thereof the plaintiffs are the owners thereof to the low water mark of the present bed of the Willamette River.

"It follows that the plaintiffs are entitled to a permanent injunction restraining defendants from going upon the property described in plaintiffs' complaint for any purpose, save and except for the removal of their duck blind in the nature of a trailer house. Should defendants desire to remove said duck blind from the plaintiffs' property they should first make application in this proceeding, indicating

definitely the date on which they desire to remove the same and the manner in which they propose moving the same, and in the absence of first securing an order of the Circuit Court for Yamhill County, any entry by the defendants or any one of them upon the premises for any purpose whatsoever will be considered as a violation of the Court's order.

"No testimony was offered with respect to the damages sustained by plaintiffs as a result of the defendants' trespass on said property, and while the Court is not unmindful that said trespass was of damage to the plaintiffs, I am without any basis for fixing such damage, and in the interest of bringing to an end a controversy of long standing that has been a source of vexatious litigation between several individuals who otherwise appear to be outstanding citizens, it would appear to the Court that the ends of justice would best be served by awarding to the plaintiffs a judgment of nominal damages in the sum of one dollar."

The appellants' brief says:

"* * * it is admitted by these appellants that if the land in question was a true accretion to the John Largent Donation Land Claim then the respondents must recover and the lower court must be sustained."

One of the valuable rights which a riparian owner possesses is the right to all additions to his land which are effected by accretion. Accretion must begin upon the land of the party who claims the newly made land, and not upon some other place from which it may eventually extend until it reaches the claimant's. The deposits of alluvion which yield the accretion must be gradual and imperceptible as distinguished from the rapid and perceptible shift which is known as avulsion: *State v. Imlah*, 135 Or 66, 294 P 1046; *Kingsley v. Jacobs*, 174 Or 514, 149 P2d 950; *Fowler v. Wood*, 73

Kan 511, 85 P 763, 6 LRS(NS) 162, 117 Am St Rep 534; *Hohl v. Iowa Central Railway Co.*, 163 Ia 66, 143 NW 850; Clark on Surveying and Boundaries, 2d ed, §§ 246 and 300; Farnham, Waters and Water Rights, §§ 845 and 845a; and 56 Am Jur, Waters, §§ 483, 484 and 489. According to *Wyckoff v. Mayfield*, 130 Or 687, 280 P 340, the law presumes, in the absence of evidence to the contrary, that changes to riparian land occurs "by accretion and not by a sudden and violent force."

It is clear that beginning about 1891 the river changed its course through the area with which we are concerned from the one which it had pursued about 1852. In the course of the change, Lot 1, as it existed about a century ago, disappeared and eventually a new body of land, also known as Lot 1, developed. The change did not occur suddenly, and the deposit of alluvion which created new Lot 1 was gradual and imperceptible.

■ We are satisfied that the trial judge correctly discerned and applied the principles of law which govern accretion. We adopt his findings and conclusions upon that issue as our own. We believe that accretion occurred to Lots 2 and 13 and that through that process there developed the area which is known as present Lot 1.

■ It is further our belief that the trial judge did not err when he ruled that the descriptions which are employed in the deeds executed by the Stoutenburgs in 1934 and by Mrs. Mahoney in 1945, as well as in the decree entered by the Circuit Court for Yamhill County in 1945, were sufficient. Mr. S. Simms, a licensed surveyor and engineer, was produced as a witness by the appellants. Appellants' counsel handed Mr. Simms a

copy of Mrs. Mahoney's deed and examined him extensively concerning the sufficiency of the description in that instrument. His attention was particularly directed to the part of the description which begins as follows: "Beginning at the Southwest corner of Lot 2" and then runs on to the end. The description is reproduced in its entirety in a preceding paragraph of this opinion. As the examination proceeded, Mr. Simms testified as follows upon direct examination:

"Q  Well, can you—could you take that description and tell exactly where that land was?

"A  Well, I think so. I believe you can. There are errors in the description, plenty of them, but then I think you can identify the land."

Upon cross-examination he gave this testimony:

"Q  As I understand your testimony, when you started to follow out, this description goes from the southwest corner of Lot 2 over to low water mark, then down the low water mark of the river to the confluence of the slough with the river and up the slough to the northeast corner of Lot 13, and across the north line of 13 and 9 to the center of the Lambert slough, and back down to the Lambert slough and down to the south side of Lot 3, and then back to the place of beginning?

"A  That's right.

"Q  And you would not have any trouble finding that, would you?

"A  No; that's all right.

"Q  And if you had that description by itself, as a surveyor you would have no difficulty in telling anybody where that land was?

"A  Well, I would have to find where the center of that slough was up there, and then I don't think I could go west from that point or northerly to the corner of 13. I would have to determine what that bank was.

"Q But you think you could work out a description?

"A Oh, I could work out a description."

In view of Mr. Simms' testimony, the description sufficed: § 70-111, subds 1 and 2, OCLA, ORS 93.310; and *Bogard v. Barhan,* 52 Or 121, 96 P 673.

■ As we have indicated, the respondents amplified their claim to title to Lot 1 by presenting evidence that they and their grantors have had open, notorious, continuous, hostile possession of the questioned tract since 1919. The parents of respondent Ersel L. Gubser received a deed to the land in 1919 and in 1933 conveyed to him. The evidence discloses that when the parents acquired the John Largent Donation Land Claim they took possession of the entire area, including present Lot 1. The elder Gubser testified that every year when he held this tract he pastured livestock upon it and made other uses of it. Respondent Ersel Gubser, as is shown in preceding paragraphs, has used Lot 1 for pasturage purposes virtually every year since 1933. He has also hunted upon it. We have seen that he secured additional deeds to the property whenever claimants have asserted themselves and that he successfully maintained a suit to quiet title to the tract. In addition, he had the appellant, Town, arrested for trespass when he observed him upon Lot 1. The respondents have posted No Trespass notices upon the lot. More than one of the appellants saw the notices and mentioned them while giving their testimony. Several times when respondent Ersel Gubser discovered appellant Town upon Lot 1 he protested and ordered him to leave the property. Some angry words were exchanged at those times. According to the testimony of Ersel Gubser, the respondents have paid the taxes upon the land in ques-

tion. We have mentioned the fence which was built many years ago and which ran along the south line of Lot 1. It will be recalled that the annual deposits of alluvion have buried parts of the fence. The respondents have replaced the fence with a new one. Without relating further details, we add that the nature of the respondents' possession is not questioned by the appellants. The latter's only attack upon that facet of the respondents' claim to title consists of a contention that, since the complaint did not aver title by adverse possession, no effect can be given to the evidence just recounted. The respondents, however, averred ownership. That allegation sufficed. *Smith v. Algona Lumber-Co.*, 73 Or 1, 136 P 7, 143 P 921.

We have given careful attention to all of the contentions advanced by the appellants in support of their assignment of error. We do not believe that the assignment of error discloses any infirmity in the circuit court's decree. The latter, according to our belief, is free from error and is correct.

The decree of the circuit court is affirmed.