Argued and submitted June 12, affirmed November 5, 1997

Charles A. BONNETT, Jr.,
*Appellant,*

*v.*

STATE OF OREGON by and through
the DIVISION OF STATE LANDS,
*Respondent,*

*and*

DRIFTWOOD SHORES, INC.,
a dissolved Oregon corporation;
Jakie L. Mann; Elsie Mann; and Robert G. Dallman,
Trustee under MBL Trust;
All Other Persons or Parties Unknown
Claiming Any Right, Title, Claim, Lien or Interest in
the Property Described in the Complaint,
*Defendants.*

(16-95-02466; CA A93571)

949 P2d 735

Frederick A. Batson argued the cause for appellant. With him on the brief was Gleaves Swearingen Larsen Potter Scott & Smith LLP.

John T. Bagg, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

## WARREN, P. J.

Plaintiff is the owner of Government Lot 1, Section 9, Township 18 South, Range 12 West in Lane County (Lot 1). When it was originally surveyed in 1878, the western boundary of Lot 1 was partly on the northeast bank of the mouth of the Siuslaw River and partly on the Pacific Ocean. In this action, plaintiff seeks to quiet title to a large amount of land that has developed west of Lot 1 since the original survey (the new land). Plaintiff took defaults against all defendants except the state. The state asserts that the land in issue first arose on state-owned tidelands west of Lot 1. As a result, the state argues, the new land did not accrete to Lot 1 and plaintiff has no title to it. After a trial, the court determined that it could not decide how the land had formed and that plaintiff, therefore, had failed to carry his burden of proof. Plaintiff appeals; we review *de novo*, ORS 19.125(3), and affirm the judgment.

■■ The facts of this case involve events that occurred a century ago and that were not the focus of anyone's attention when they happened. Much of the relevant evidence comes from maps and other materials that were produced for purposes only tangentially related to the issues before us. Resolving the factual issues requires us to consider both the scientific question of how land generally forms on the ocean shore and the historical question of what happened in this specific case. We have carefully reviewed the record, including the testimony and the related exhibits, and find, by a preponderance of the evidence, that the following facts are correct. An exhaustive discussion of the reasons for our findings would be of no benefit to the parties, the bench, or the bar. For that reason, we state our findings without elaboration except for one or two crucial points.[1]

---

[1] We base our factual findings and legal conclusions solely on the evidence at trial. Although the parties argue extensively about the trial court's denial of plaintiff's motion for summary judgment, that denial is not reviewable on appeal. *See Payless Drug Stores v. Brown*, 300 Or 243, 246-47, 708 P2d 1143 (1986) (denial of motion for summary judgment is reviewable only if motion is based on purely legal ground, such as facial constitutionality of statute). Contrary to plaintiff's suggestion, our *de novo* review of a case in equity does not affect the rule in *Brown*. A decision on a motion for summary judgment is *always* a question of law, whether the case is legal or equitable. A court that rules on the motion does not find facts but

The Siuslaw River enters the Pacific Ocean west of Florence. Before the erection of jetties in the 1890s and early 1900s, the main channel of the river moved back and forth across a wide, sandy mouth. At times there were two channels, sometimes with an island between them. Much of the area in the mouth outside of the channels was exposed at low tide.

In 1878, the time of the official survey, the main channel of the river followed a bluff that ran north and northwest along the river's mouth and, thereafter, ran along and parallel to the ocean. The main channel met the ocean at a point along the western edge of Lot 1, which was at the eastern edge of the area over which it normally wandered. The permanent dry land on the opposite bank of the river ended at the southerly limit of the river's normal wanderings, over a mile south of that point. There is no direct evidence of the nature of the area directly across the river from Lot 1 in 1878 or whether there was a secondary channel at that time. It is clear that there was no island in the river's mouth. Records concerning the area at other times make it probable that a significant portion of the opposite side of the 1878 channel would have been dry at low tide.

The bluff that bordered the 1878 channel was a short distance west of the western edge of Section 10. Thus, in 1878 there was only a small part of Section 9 for the surveyor to survey. He therefore divided what existed of the section into four government lots, running north and south along the bluff. Lot 1 was the northernmost, with lots 2, 3, and 4 successively south of it. For each lot the eastern, northern, and southern boundaries were fixed lines, while the western boundary was a meander line that followed the bluff. In lots 4 and 3 the bluff generally runs from south to north. Partway through lot 2 it turns to the northwest. In Lot 1 the bluff, and thus the meander line, runs from southeast to northwest. Both continue in that direction well into Section 4, which is

determines *only* whether there is a genuine issue of material fact that requires a trial. ORCP 47 C. *De novo* review concerns a trial court's factual findings and has nothing to do with such questions of law. *See Trabosh v. Washington County*, 140 Or App 159, 163 n 6, 915 P2d 1011 (1996). We consider the arguments relating to the motion for summary judgment only to the extent that they are relevant to the issues and evidence at trial.

directly north of Section 9. Near a place in Section 4 designated in later maps as "Northpoint" the meander line turns due north again.

By the early 1880s the main channel of the river had moved south, away from Lot 1; there was also the beginning of a secondary channel farther south, near the river's permanent southwestern bank. At the same time, a sand spit had formed near Northpoint and moved south, cutting the original Lot 1 off from the ocean. The spit was attached to the upland at Northpoint, but before it reached Lot 1 it moved away from the bluff and grew exclusively on the tidelands that formerly constituted the opposite side of the main channel of the river. As a result of these changes, the former main channel south of Lot 1 had become an isolated lagoon. Along Lot 1 at the base of the bluff was a narrow lowland that was probably covered with water, at least in wet seasons, and that divided Lot 1 from the new sand spit.

The sand spit grew over the following years, moving south towards the river's newer channels. In doing so, it generally followed the west side of the 1878 main channel. In the vicinity of Lot 1, the spit was close to the bluff from the beginning but may also have moved east to fill in some of that area. Around the turn of the century, the Army Corps of Engineers built jetties that created a new, fixed channel of the river near the southern end of its previous wanderings. As a result of the jetties' interference with the normal seasonal movement of sand, the spit grew rapidly to the west and also filled in most of the places between the spit and the north jetty. The spit thus became a permanent addition west of the bluff, rather than a temporary aspect of the river's wanderings.

After this creation of new land from the spit, the lagoon along the former channel south of Lot 1 remained (and remains), while the area directly in front of Lot 1 at the base of the bluff is now relatively low-lying, densely vegetated, and has damp, marshy soil. Since the introduction of European eel grass in the 1940s, the rest of the area west of Lot 1 consists of dunes that have become stabilized and heavily vegetated. The low area at the base of the bluff still makes it possible to distinguish the new land from the original Lot 1.

This description of how the land west of Lot 1 formed is the foundation for the legal conclusions that we reach. We base that description on a number of factors. It is undisputed that a sand spit formed, growing southward, when the river channel moved south after 1878. That is what contemporary maps show, and it is consistent with how sand moves along the Oregon coast. It is also clear that, ever since then, there has been a lagoon in a portion of the former channel that is south of Lot 1, showing that, at least in that area, the spit grew west of the former channel. Maps based on 1883 surveys show a narrow but distinct low area between the bottom of the bluff at the west edge of Lot 1 and the sand spit that had grown in front of it. That low area appears to have played the same role in front of Lot 1 that the lagoon played in the area to the south—it separated the bluff from the newly formed sand.

Later maps generally give less detailed attention to the area in front of Lot 1. However, aerial photographs over the last 60 years clearly show the bluff, the lagoon, and the low land at the base of the bluff north of the lagoon. They, together with testimony concerning the current terrain below the bluff, show that it is still possible to discern a division line between the new sand dunes west of Lot 1 and the old land, from the base of the bluff east, that existed at the time of the 1878 survey. Testimony also shows that that area is, even now, particularly wet and marshy and, at least at times, is covered with water. The division between the bluff and the new land, thus, has existed since the river moved away from the bluff. It leads us to conclude that the new land grew from the north to the southeast, with the old channel separating it from the bluff.

We find, thus, that the land in question was created by a process that began with the creation of a sand spit on tidal lands west of Lot 1 and then continued as the spit grew by accretion so that, on its eastern side, it approached Lot 1 on the east and, on its western side, reclaimed substantial tidal and ocean lands.[2]

---

[2] Plaintiff argues that the river receded from the land in front of Lot 1, thus adding the newly dry land to Lot 1 by reliction and providing a connection between Lot 1 and the new land. So far as we can determine, the sand spit came into

■ Plaintiff argues that he is entitled to the new land west of Lot 1 because of his rights as a riparian or littoral[3] owner. He relies on the rule that, when land borders a body of water, a grant of that land conveys to the edge of a navigable waterway or to the thread of a nonnavigable stream. The meander line that a surveyor may use to approximate the riparian boundary is not itself the precise boundary. Rather, the purpose of a meander line is to make it possible to calculate the acreage of the parcel for purposes of sale. The water, not the meander line, is the true boundary. The crucial point for this case is that the actual boundary moves as the waterway's course changes through the gradual processes of accretion, reliction, and erosion. *See Allison v. Shepherd*, 285 Or 447, 453, 591 P2d 735 (1979); *Morse Bros., Inc. v. Wallace*, 78 Or App 138, 140 n 2, 714 P2d 1095, *rev den* 301 Or 165 (1986).[4]

Plaintiff's argument is that, because he is the upland owner, and because the land grew by accretion, he automatically became the owner of the new land. He cites the general rule that "the right to future accretions is an inherent and essential attribute of the littoral or riparian owner." *California ex rel. State Lands Comm'n v. U.S.*, 457 US 273, 284, 102 S Ct 2432, 73 L Ed 2d 1 (1982); *see also Hanson v. Thornton*, 91 Or 585, 590, 179 P 494 (1919). He also refers to *Cal. ex rel.*

existence west of Lot 1 either before or at the same time as the water receded. Any reliction, thus, would have added land to the spit at the same time that it added land to Lot 1 and would not have affected the role of the base of the bluff as dividing Lot 1 from the new land. For this reason, the distinction between accretion and reliction does not affect our decision. References in this opinion to accretion include both concepts.

[3] Plaintiff's right to accretions on the ocean shore are properly described as littoral rather than riparian rights. *See Darling v. Christensen*, 166 Or 17, 34-35, 109 P2d 585 (1941). However, the relevant rules are the same in both cases. We thus do not distinguish between plaintiff's rights in the area of Lot 1 that bordered the river in 1878 and the area that then bordered the ocean. Our references to plaintiff's riparian rights include his littoral rights.

[4] Plaintiff argues that the trial court erroneously applied state law to this case, because federal law controls the right to accretions to oceanfront land when the title to the upland is derived from the federal government. *See California ex rel State Lands Comm'n v. U.S.*, 457 US 273, 102 S Ct 2432, 73 L Ed 2d 1 (1982). It is not clear to us that the trial court followed state law to the exclusion of federal law. In any case, the state and federal rules appear to be the same so far as the issues in this case are concerned. To the degree that state law is more developed than federal law on the issues involved, it is appropriate under the circumstances of this case to borrow that law as the federal rule of decision. *See id.*, 457 US at 283.

*State Lands Com'n. v. United States*, 805 F2d 857 (9th Cir 1986), in which the Ninth Circuit held that the federal government, as the upland owner, acquired title to a portion of a state-owned lakebed when the lake receded from that portion.

The problem with plaintiff's arguments is that he treats whether the new land accreted to, or the water receded from, only Lot 1 as irrelevant. He ignores that, in the cases on which he relies, there was no dispute that the new land was directly attached to the former upland. In the Supreme Court case, the parties agreed that the land accreted to a Coast Guard reservation; the issue was who was entitled to the artificial accretions. In the Ninth Circuit case, the lake, although reduced in size, remained in existence and continued to divide the land on one side from the land on the other side. The issue was what happened to the state's title to the lakebed, not who would own the newly dry land if the lake had receded so far that properties that were originally on opposite shores now met in the middle of the former lakebed.

■ In this case the foundation for plaintiff's arguments does not exist. The land in question did not arise next to Lot 1 but on tidelands on the opposite side of the former riverbed from it. To the degree that the water receded from its former channel, it did so after the new land came into existence. At the time of the 1878 survey, the land on which the new land later arose belonged to the state.[5] Thus, the new land formed on the state's land, not by accretion to plaintiff's land.

■ The United States Supreme Court has recognized that "[i]t is well settled that the owner in fee of the bed of a river, or other submerged land, is the owner of any bar, island or dry land which subsequently may be formed thereon." *City of St. Louis v. Rutz*, 138 US 226, 247, 11 S Ct 337, 34 L Ed 941 (1891).[6] Under Oregon law, "[a]ccretion

---

[5] On its admission to the Union the state became the owner of all tidelands. *Shively v. Bowlby*, 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894). Tidelands "are lands usually or ordinarily covered and uncovered every 24 hours by the action of the tides." *State Land Board v. Sause et al*, 217 Or 52, 67, 342 P2d 803 (1959).

[6] Under Illinois law, the riparian owner in *City of St. Louis v. Rutz*, 138 US 226, 11 S Ct 337, 34 L Ed 941 (1891), owned the riverbed to the center of the main channel. As a result, some of the other conclusions that the Supreme Court reached in that case do not apply in Oregon, where the state retains the ownership of

must begin upon the land of the party who claims the newly made land, and not upon some other place from which it may eventually extend until it reaches the claimant's." *Gubser v. Town and Stoutenburg*, 202 Or 55, 72, 273 P2d 430 (1954). Thus, when an island forms in a navigable river and then grows by accretion to the bank of the river, the state owns both the former island and the accreted land. *Magee v. Yamhill County*, 244 Or 567, 419 P2d 420 (1966); *see also Strasbaugh v. Babler Bros. et al*, 220 Or 35, 37-38, 348 P2d 448 (1960). The parties do not direct us to federal law that expressly deals with the issue, but Oregon law on this point is consistent with the basis for the Supreme Court's statement in *Rutz*; we therefore adopt it as the federal rule of decision.

Thus, if new land had formed as an island it would clearly belong to the state. In this case, of course, the new land did not form as an island but as a spit that began attached to land north of Lot 1 and then moved south, separating from the former upland before it reached the area adjacent to Lot 1. The spit was never physically an island. To that extent, this case is different from cases in which an island developed on state-owned tidal lands and then moved shoreward by accretion. Instead, the new land was connected to the upland around Northpoint from the time that it began accreting and moved south from that area to separate Lot 1 from the ocean.

Plaintiff argues that denying its claim to the new land would lead to the conclusion that the new land belongs to the owner of the land around Northpoint, where the spit began and where it was attached to the upland. Plaintiff points out that adopting that approach could lead to unacceptable consequences.[7] He argues that holding that the entire spit belongs to the owner of the land "on which the first grain of sand is deposited," would also deprive the state of all of the new land north of the jetty. "If someone besides Plaintiff owns the first property on the north shore, where the

tidelands and the beds of navigable rivers. *See Van Dusen Inv. Co. v. Western Fishing Co.*, 63 Or 7, 19-20, 124 P 677, 126 P 604 (1912).

[7] Plaintiff does not argue that because, under this approach, the state had no interest in the new land, and because plaintiff has obtained default judgments against all known or unknown claimants, plaintiff's claims to the new land are superior to the state's and that he is therefore entitled to quiet his title against it.

accretion began, * * * that person now owns the entire beach north of the jetty all the way north to where the accretion began on the Heceta Head beach." That result, he points out, would deprive all of the riparian owners of their access to the water, which is the essential purpose for riparian rights.

■     Plaintiff's concerns are overstated. First, he fails to recognize that, as we have found, the new land did not accrete to Lot 1 and that he therefore lost his water access as a result of the natural processes that led to the formation of the new land.[8] Secondly, the owner of the land around Northpoint could not follow the accretion beyond the extended southern boundary of his lot. That land, like all of the other government lots along the bluff, has a meander line only as its western boundary. The other three boundaries of the lot are fixed lines that did not, and do not, have a riparian location. Thus, only the western boundary of the lot is subject to movement as the result of accretion, reliction, or erosion. Courts generally refuse to allow one riparian owner to extend its property laterally in front of other riparian owners simply because land began accreting laterally from the first owner's land. *See* Anno., "Right to Accretion Built Up From One Tract of Land and Extending Laterally in Front of Adjoining Tract Without Being Contiguous Thereto," 61 ALR3d 1173 (1975).[9] At least one court has done so even when the relevant boundary was a meander line. *See Hudson House, Inc. v. Rozman*, 82 Wash 2d 178, 509 P2d 992 (1973).

   *Archer v. Southern Ry Co. in Mississippi*, 114 Miss 403, 75 So 251 (1917), provides a helpful analogy to this case. In *Archer*, an island arose on the bed of the Mississippi River directly opposite the plaintiff's property. Because, under Mississippi law, the plaintiff owned the bed of the river to its center line, the island belonged to her. The island thereafter

---

[8] If the new land had accreted from Lot 1 westward, it would not matter if the accretion process began elsewhere.

[9] The cases discussed in this annotation often rely on theories that plaintiff neither raises nor discusses. We need not decide, therefore, the extent to which those theories are consistent with federal or Oregon law or what effect they would have on this case. The point is that few if any courts would permit the owner of the land near Northpoint to pursue ownership of the sand spit south of the westward extension of the southern boundary of its land.

grew by accretion laterally along the river so that its northern end went beyond the northern boundary of plaintiff's land and was opposite the defendant's land.[10] The court held that the plaintiff's ownership of the island ended where her property line, extended from the shore of the river, crossed the island; everything to the north of that point belonged to the defendant. It stated that there had to be a limit to the ownership of offshore islands and that making that limit the property line of the owner fit the "general principles of convenience, justice, and common rights of property." 75 So at 252.

*Archer* suggests that a fixed boundary does not become subject to riparian rules simply because new land has developed as a result of riparian processes. In this case, the owner of Northpoint has the riparian right to all accretions to its western boundary, just as the plaintiff in *Archer* was entitled to the island that arose on her portion of the riverbed. However, when the new land passed the extension of that owner's fixed southern boundary, it entered another entity's property, just as the island in *Archer* entered another's property when it passed the fixed northern boundary of the plaintiff's land. In this case, as in *Archer*, the new land passed a boundary that did not in itself include riparian rights. The Northpoint owner,[11] thus, did not have an absolute right to follow the new land beyond the fixed southern border of its land.[12]

The new land south of the northern boundary of Lot 1, thus, is beyond the extent of the Northpoint owner's riparian rights. At the same time, it was also not an accretion to Lot 1. We conclude that it is most reasonable to treat the new land as if it were an island that arose on the tidelands across the former river channel from Lot 1. Such an island would belong to the state as the owner of the tidelands on which it arose. The new land, therefore, belongs to the state as the

---

[10] The defendant, like the plaintiff, owned the riverbed to its center line.

[11] To the extent that the Northpoint owner might assert its own interest in the land, the default judgment against all other persons claiming any right in the land would likely resolve that claim as against plaintiff.

[12] This discussion does not foreclose the adoption, in another case, of some appropriate method of apportioning accretions among riparian owners.

owner of the tidelands, and the trial court correctly refused to quiet title to that land in plaintiff.[13]

Affirmed.

---

[13] We recognize that the result of our decision is that plaintiff's land will lose its riparian character, at least until the new land erodes back to the bluff. That result is an inherent consequence of the way in which the new land arose.