Argued and submitted September 28, affirmed December 5, 2012, petition for review allowed May 16, 2013 (353 Or 562)

SEA RIVER PROPERTIES, LLC,
an Oregon limited liability company,
*Plaintiff-Appellant*,

*v.*

Loren E. PARKS,
an individual,
*Defendant-Respondent*.

Loren E. PARKS,
an individual,
*Third-Party Plaintiff*,

*v.*

H. Robert RILEY
and Geneva Ruth Riley,
both individually and as Trustees of the
H. Robert Riley Trust and Geneva Ruth Riley Trust;
Donald Lee Riley and Lee Ann Riley,
husband and wife;
David Robert Riley and Catherine Lou Riley,
husband and wife,
*Third Party Defendants*.

Tillamook County Circuit Court
062011; A145896

297 P3d 1

Robyn Ridler Aoyagi argued the cause and filed the briefs for appellant.

Carla Scott argued the cause for respondent. With her on the brief were Laura J. Walker, Gretchen S. Barnes, and Cable Huston Benedict Haagensen & Lloyd LLP.

Before Armstrong, Presiding Judge, and Brewer, Judge, and Duncan, Judge.

BREWER, J.

**BREWER, J.**

Plaintiff appeals a judgment in which the trial court quieted title in favor of defendant Parks, based on adverse possession, to 40 acres of undeveloped land located in the coastal town of Nedonna Beach. The trial court's decision was premised on the intermediate conclusion that plaintiff was the record owner of the property based on the doctrine of accretion. Defendant cross-assigns error to that conclusion. Because we agree with defendant that plaintiff failed to establish that it was the record owner of the disputed property, we affirm, albeit on different grounds.

Adverse possession and quiet title claims are equitable in origin and, thus, traditionally were subject to mandatory *de novo* review on appeal. *Fitts v. Case*, 243 Or App 543, 545 n 1, 267 P3d 160 (2011). *De novo* review is now discretionary, but disfavored. ORS 19.415(3)(b); ORAP 5.40(8)(c). Despite the parties' requests that we review *de novo* parts of the trial court's decision with which they disagree, we decline to do so because it would be of little benefit to our resolution of the dispositive issues on appeal. Accordingly, we rely on the trial court's findings of fact that are supported by any evidence, and we review the court's conclusions for errors of law. *DHS. v. Three Affiliated Tribes of Fort Berthold*, 236 Or App 535, 541, 238 P3d 40 (2010). Although the record in this case is voluminous, and the trial court rendered a lengthy and thoughtful written opinion, we recite only those facts that are necessary to explain our decision.

The disputed property is located near the confluence of the Nehalem River and the Pacific Ocean. The property is wild and undeveloped, consisting of sand, trees, and open meadow. There has been a dispute since 1975 as to who holds title to the property. That dispute is largely due to the fact that the land formed relatively recently—within the last century or so—by accretion. Accretion is a natural process by which the forces of wind and water create coastal or other riparian land. A map showing the current configuration and location of the disputed property (below the south jetty and to the west of Lot 4) and the Nehalem River channel is attached to this opinion as Appendix 1.

In the 1850s, the federal government commissioned a survey and subdivision of Oregon's coastal lands based on the Public Land Survey System (PLSS). The PLSS system of townships, sections, and government lots is used to describe property now in private ownership. Two sections created under that survey are at issue here: section 17 to the north and section 20 to the south. The sections are divided by an east-west section line that is the southern boundary of section 17 and the northern boundary of section 20. When they were originally platted, both sections' western boundary was the Pacific Ocean. As pertinent to this case, each section is divided into four lots, numbered starting at the north from one to four. Defendant owns section 17, Lot 4—that is, the southernmost lot of section 17. Plaintiff owns the "natural accretions" to the west of section 20, Lots 1 and 2. A survey map showing the configurations and locations of Lot 4, section 17, Lots 1 and 2, section 20, and the Nehalem River channel in 1858 is attached to this opinion as Appendix 2.

Before 1918, the Nehalem River was not in a fixed position, but rather alternated between two channels due to natural forces. The northern channel ended just north of Lot 4, section 17, as originally platted in 1858. During intervening years, the river moved into the southern channel, causing the development of additional tidelands to the west of both sections 17 and 20. Because the Nehalem bar was dangerous for ships, the federal government built a jetty to create a fixed channel for the river, which was completed in 1918, ultimately directing the river through the northern channel again. The construction of the arm of the jetty to the north of sections 17 and 20 caused gradual accumulation of sand over tidelands adjacent to both sections and, ultimately, dry land was created to the west of both sections. The dry land west of section 17, Lot 4, is the disputed property in this case. A map showing the configurations and locations of the parcels at issue and the Nehalem River channel in 1911 (with most of the disputed property shown as tidelands to the west of the Nehalem River channel), when the area was surveyed by the United States Army Corps of Engineers, is attached to this opinion as Appendix 3.

With that backdrop in mind, we turn briefly to the record title histories that the parties proffered in support

of their respective claims. In 1883, the State of Oregon conveyed to William Hiatt by bargain and sale deed "all the tide lands lying west of and fronting and abutting upon lots 2, 3, and 4 of section 17." In 1908, the State Land Board patented to Wright Blodgett Company a 306-acre parcel of land that included Lot 4, section 17. By separate deeds, Wright Blodgett Company later conveyed both Lot 4, section 17, and the tidelands fronting and abutting Lot 4, to one of defendant's remote predecessors in title.[1] In 1989, defendant purchased Lot 4, and all tidelands fronting and abutting Lot 4, for $75,000.

Plaintiff bases its claim to the disputed property on a quitclaim deed that it obtained shortly before filing this lawsuit; that deed purported to convey title to "natural accretions" to Lots 1 and 2 of section 20 that are situated within property in section 17. Plaintiff's claim derives from Robert Riley's chain of title. Riley's chain of title began with a deed recorded in 1888, which carved out a 10-acre parcel of property located in section 20, consisting of Lots 1, 2, 3, and 4, from a larger tract. Presumably due to the Nehalem River's location within the southern channel at that point in time, the legal description for the 10-acre parcel originally included the Nehalem River as a part of its northern boundary.

In 1926, after accretions had begun to fill in the tidelands in the area, the owners of the 10-acre parcel and the remainder parcel in section 20 entered into a boundary-line agreement. The stated purpose of that agreement was to establish a boundary line because portions of the boundaries of the 10-acre parcel had been "obliterated." The respective owners reallocated ownership of Lots 1, 2, 3, and 4 of section 20, such that Riley's predecessor owned the portion of those lots north of the boundary line. The legal description no longer included any reference to the Nehalem River, and it expressly stated that the properties were "all in Section 20." Riley acquired the 10-acre parcel in 1944. Over the ensuing decades, Riley subdivided that property into eight plats. Sometimes the deed calls in transactions relating to the remnants of the 10-acre parcel in section 20 referred to the Nehalem River, but often they did not.

---

[1] Although the record does not explain how title to the tidelands abutting Lot 4 and the title to Lot 4 itself became unified in Wright Blodgett Company, plaintiff does not dispute that defendant ultimately acquired title to both.

In 1996, decades after Lots 1 and 2, section 20, had been subdivided and sold to various purchasers, Riley recorded a deed purporting to convey "all the natural accretions" to Lots 1 and 2, section 20, to a trust. In 1998, in exchange for $500, Riley executed a deed to 3 & 3, LLC (3 & 3) purporting to convey "all the natural accretions" to Lots 1 and 2. Referring to a survey "subsequently completed," that deed was re-recorded in 1999 with a new metes and bounds legal description referring to a 24.197-acre parcel located in section 17. 3 & 3 pledged the property described in the re-recorded deed, along with other property, as collateral for a loan which was subsequently subject to a foreclosure sale. In 2005, plaintiff purchased the accretions by a quitclaim deed following the foreclosure sale.

In 2006, plaintiff filed this action against defendant to quiet title to the disputed property, asserting ownership based on record title, or alternatively, accretion or adverse possession. As pertinent here, defendant counterclaimed to quiet title in his own favor. The case was tried to the court. The predominant focus at trial was on the deed history to the disputed property and how that property had been formed, with both sides offering multiple expert witnesses. In April 2010, the trial court issued its opinion. In that opinion, the court exhaustively reviewed the deed history and expert testimony. The court concluded that defendant's chain of title to Lot 4, section 17, and the Lot 4 tidelands was established in the deed record. The court also concluded that there are deeds in plaintiff's chain of title suggesting a transfer of ownership of all natural accretions to Lots 1 and 2, section 20, and that that property "may include some of the disputed property."

The court reasoned that whether plaintiff's chain of title included any of the disputed property depended on the extent to which it was entitled to that property under accretion principles. In analyzing plaintiff's accretion claim, the trial court adopted testimony from plaintiff's expert witnesses regarding "the mechanism by which at least some of the property accreted from government Lot 1, Section 20 to the north and east." The court found and concluded:

"By about 1911, a substantial amount of the property owned by [defendant's] grantors was eroded by the southern

movement of the Nehalem River. That property could only have been restored by accretion or avulsion.

"If it was restored by accretion, then the boundaries moved with the waterline. If it was restored by avulsion, the boundaries did not change."

The court concluded that the disputed property was formed by accretion from Lots 1 and 2, section 20, and that it "was non-contiguous with the property transferred to [defendant] by his predecessors in interest." The court explained:

"Looking at all the evidence in this record, this Court concludes, as did expert Larson that, because the western boundary of [defendant's] property was defined by the centerline of the old [Nehalem River] channel, [defendant's] property ceased being riparian property. For that reason, the law concerning lateral accretion does not apply to this case.

"As a result of the above conclusions, the Court further concludes that the accretions were formed in such a way that they became part of Lot 1 in Section 20."

The court nevertheless concluded that defendant owned all of the disputed property by adverse possession; accordingly, the court entered judgment for defendant.

Plaintiff assigns error to the trial court's conclusion that defendant owned the disputed property by adverse possession. Defendant cross-assigns error to the trial court's determination that plaintiff had previously held the underlying title to the disputed property based on accretion principles. Because we conclude that the trial court was mistaken in concluding that plaintiff's predecessors had previously acquired any of the disputed property based on accretion, we affirm its ultimate judgment for defendant.

Although the trial court did not definitively accept or reject plaintiff's argument that it held record title to the disputed property based on its deed claim, we begin with that issue, because it is foundational. According to the testimony of plaintiff's expert witness, Larson, by 1911, when the Army Corps of Engineers surveyed the area, the Nehalem River had moved to a southern channel, thereby eroding substantial portions of Lot 4, section 17, and Lot 1, section 20.

In Larson's view, that circumstance probably explained why the first deed conveying Lots 1 and 2, section 20, referred to the Nehalem River as the northern boundary. Larson ultimately opined that plaintiff had established record title to the disputed property because, when the channel of the river permanently moved to the north of the disputed property after the jetty was constructed, the northern boundary of Lot 1 of section 20 moved north with the river. Larson based that opinion, in part, on the surveying principle that "a call to a natural monument prevails over a call to a section line."

Leaving aside the problem posed by the omission of any call to the Nehalem River in some of the later instruments in plaintiff's chain of title, we reject plaintiff's view of the controlling legal principles for a more fundamental reason. The boundary between Lot 4, section 17, and Lot 1, section 20, was established as a straight east-west line by the original PLSS survey of the coastal area by the United States government when those lots were created in 1858. At that time, there was no reference to the Nehalem River in the description of either lot. When that reference first appeared in plaintiff's chain of title in 1883, according to plaintiff's own evidence, it most likely was because the river channel had moved south into section 20 after the original government lot boundaries were established. The rule of construction preferring visible monuments over other calls, ORS 93.310(2), is in part a recognition that objects that can be seen, rather than the designation of invisible referents, are normally intended by the parties to enclose the land conveyed. *O'Gorman v. Baker*, 219 Or 170, 206, 347 P2d 85 (1959).[2] But it would be nifty legal footwork, indeed, if that principle could change a boundary between separate lots divided by a common section line after they have been created, where there is no evidence that such a monument had any reference to the common boundary

___

[2] ORS 93.310(2) provides:

"The following are the rules for construing the descriptive part of a conveyance of real property, when the construction is doubtful, and there are no other sufficient circumstances to determine it:

"*****

"(2) When permanent and visible or ascertained boundaries or monuments are inconsistent with the measurement, either of lines, angles or surfaces, the boundaries or monuments are paramount."

of the lots when they were created. The record boundary between the parties' properties is not doubtful in this case; it is the east-west section line between sections 17 and 20. It follows that the Nehalem River never was, and is not now, the boundary between Lot 4, section 17, and Lot 1, section 20. *See, e.g., Baker County v. Benson*, 40 Or 207, 219, 66 P 815 (1901) ("[T]he law will presume a straight line was intended in a description of land in a deed, when the call is simply from one monument to another; but when the call is from a monument to a creek, without naming a given point, the creek is not a monument, in the sense of that rule.").

Because the disputed property was never included in the direct chain of title to Lots 1 and 2, section 20, plaintiff's claim, if any, must derive from the principles governing the ownership of accreted property. Accretion is defined as "[a]ddition of portions of soil, by gradual deposition through the operation of natural causes, to that already in possession of owner." *Black's Law Dictionary* 20 (6th ed 1990). When new land is formed by the process of accretion, the actual boundary moves as the waterway's course changes. *See Allison v. Shepherd*, 285 Or 447, 453, 591 P2d 735 (1979); *Morse Bros., Inc. v. Wallace*, 78 Or App 138, 140 n 2, 714 P2d 1095, *rev den*, 301 Or 165 (1986). Plaintiff asserts, and the trial court agreed, that because the disputed property was formed by accretion resulting from sand deposits originating from Lots 1 and 2, section 20, after the permanent channel of the Nehalem River was moved to the north of Lot 4, section 17, plaintiff is the owner of the accretions.

Our dispute is not with the facts that the trial court found. Because there is evidence to support them, we are bound by those facts. Rather, we disagree with the conclusions that the court drew from those facts. The foundation of our disagreement rests on the character of the disputed property before the accretions occurred. As the map in Appendix 3 indicates, the disputed property consisted mostly of tidelands when the construction of the Nehalem River jetties was underway. Tidelands "are lands usually or ordinarily covered and uncovered every 24 hours by the action of the tides." *State Land Board v. Sause et al.*, 217 Or 52, 67, 342 P2d 803 (1959). On its admission to the Union, the state became the owner of all tidelands. *See generally*

*Shively v. Bowlby*, 152 US 1, 14 S Ct 548, 38 L Ed 331 (1894). Thus, although the tidelands on which the accretions were formed lay to the west of the old southern channel of the Nehalem River, they were owned either by the state or by defendant's predecessor in title to Lot 4, section 17, by virtue of the 1883 tidelands deed from the state to Hiatt. In either case, however, they did not belong to the owner of Lots 1 and 2 of section 20. Plaintiff's theory that, because the sand deposits that elevated the disputed property to dry land emanated from Lots 1 and 2 of section 20, the disputed property became plaintiff's property, misunderstands the doctrine of accretion. The disputed property existed as tidelands before the accretions commenced; accordingly, it was owned by someone. The deposits of additional sand did not alter that ownership.

We made the same point in a different context in *Bonnett v. State By and Through Div of State Lands*, 151 Or App 143, 949 P2d 735 (1997). In that case, an upland owner claimed ownership of accreted land along the mouth of the Siuslaw River. However, the disputed land arose on tidelands owned by the State of Oregon. We explained:

"In this case the foundation for plaintiff's arguments does not exist. The land in question did not arise next to [the plaintiff's property] but on tidelands on the opposite side of the former river bed from it. To the degree that the water receded from its former channel, it did so after the new land came into existence. At the time of the 1878 survey, the land on which the new land later arose belonged to the state. Thus, the new land formed on the state's land, not by accretion to plaintiff's land.

"The United States Supreme Court has recognized that '[i]t is well settled that the owner in fee of the bed of a river, or other submerged land, is the owner of any bar, island or dry land which subsequently may be formed thereon.' *City of St. Louis v. Rutz*, 138 US 226, 247, 11 S Ct 337, 345, 34 L Ed 941 (1891). Under Oregon law, '[a]ccretion must begin upon the land of the party who claims the newly made land, and not upon some other place from which it may eventually extend until it reaches the claimant's.' *Gubser v. Town and Stoutenburg*, 202 Or 55, 72, 273 P2d 430 (1954). Thus, when an island forms in a navigable river and then grows by accretion to the bank of the river, the state owns

> both the former island and the accreted land. *Magee v.
> Yamhill County*, 244 Or 567, 419 P2d 420 (1966); *see also
> Strasbaugh v. Babler Bros. et al*, 220 Or 35, 37-38, 348 P2d
> 448 (1960). The parties do not direct us to federal law that
> expressly deals with the issue, but Oregon law on this
> point is consistent with the basis for the Supreme Court's
> statement in *Rutz*; we therefore adopt it as the federal rule
> of decision."

*Bonnett*, 151 Or App at 150. Similarly, here, the disputed property formed on existing tidelands. It therefore belonged to the owner of the tidelands. The source of the deposition that created the new land is not dispositive; the ownership of the land whereupon that new land was formed is the controlling consideration. It follows that the trial court erred in concluding that plaintiff and its predecessors previously owned the disputed property based on accretion.

Although the foregoing conclusion is sufficient to dispose of plaintiff's accretion claim, there is another basis for rejecting it. Larson opined, and the trial court agreed, that, when the Nehalem River moved to its southern channel sometime after 1858, the tidelands fronting and abutting Lot 4 consisted solely of the small area of Nehalem River tidelands lying between its low and high water lines on the east bank. Larson reasoned that, when the river moved to the north after the jetties were constructed, the western boundary of Lot 4 moved to the centerline of the dry southern channel bed but not further to the west. We disagree.

Although the movement of the Nehalem River before 1911 eroded portions of Lot 4, as noted, tidelands existed to the west of the southern channel of the river after it bisected Lot 4. The state had previously conveyed those tidelands to defendant's predecessor.[3] We are aware of no legal principle supporting the proposition that defendant's predecessors' ownership of those tidelands was lost merely because the river periodically came to divide them from the rest of Lot 4. To the contrary, because defendant's predecessors owned the tidelands on both sides of the southern river channel,

---

[3] There is no indication in the record that the state claims any interest in the disputed property. Accordingly, there is no reason to treat it as a necessary party to this action.

their littoral access to ocean frontage persisted against any rival claim under the doctrine of lateral accretion. As we noted in *Bonnett*,

> "[c]ourts generally refuse to allow one riparian owner to extend its property laterally in front of other riparian owners simply because land began accreting laterally from the first owner's land. *See Ann.*, 'Right to Accretion Built Up From One Tract of Land and Extending Laterally in Front of Adjoining Tract Without Being Contiguous Thereto,' 61 ALR 3d 1173 (1975). At least one court has done so even when the relevant boundary was a meander line. *See Hudson House, Inc. v. Rozman*, 82 Wash 2d 178, 509 P2d 992 (1973)."

*Bonnett*, 151 Or App at 152.[4]

To summarize: the evidence established that plaintiff had no claim to ownership of the disputed property either by deed or accretion. Instead, defendant owned the disputed property by virtue of his own chain of title and the doctrine of accretion.[5]

Affirmed.

---

[4] In this case, according to the surveyor's notes, the western boundary of Lot 4 as originally created was the meander line of the Pacific Ocean. Although a meander line does not constitute a formal legal boundary, as noted in *Bonnett*, the doctrine of lateral accretion has been applied to protect riparian boundaries that are defined by meander lines.

[5] Our disposition makes it unnecessary to consider the parties' arguments concerning defendant's claim based on adverse possession. In addition, although plaintiff alternatively asserted ownership of the disputed property by adverse possession before the trial court, it does not urge that claim on appeal. In any event, we would reject it without discussion.